168 P.3d 1273 (2007)
STATE of Washington, Respondent,
v.
James Douglas OHLSON, Petitioner.
No. 78238-5.
Supreme Court of Washington, En Banc.
Argued January 11, 2007.
Decided October 18, 2007.
*1274 Michelle Bacon Adams, Attorney at Law, Port Orchard, WA, for Petitioner.
Randall Avery Sutton, Jeremy Aaron Morris, Kitsap Co. Prosecutor's Office, Port Orchard, WA, for Respondent.
FAIRHURST, J.
¶ 1 James Douglas Ohlson was convicted of two counts of assault in the second degree following a jury trial at which one victim, L.F., testified and the other victim, D.L., did not. Ohlson appeals his conviction on the grounds that D.L.'s out-of-court statements were improperly admitted as excited utterances and that admitting the statements violated Ohlson's Sixth Amendment right to confrontation. We hold that the trial court did not abuse its discretion by admitting D.L.'s statements as excited utterances. While we reject the Court of Appeals' per se rule that excited utterances can never be testimonial, we hold, under the facts presented here, that D.L.'s statements were nontestimonial and thus their admission did not violate Ohlson's right to confrontation under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) and Davis v. Washington, ___ U.S. ___, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). We affirm the Court of Appeals in part and reverse in part.

I. FACTUAL AND PROCEDURAL HISTORY
¶ 2 On April 16, 2004, two minors, L.F. and D.L., were standing on the sidewalk near the entrance to Lion's Field in Bremerton, Washington, waiting for their mothers to pick them up. L.F. testified that as she and D.L. were waiting, Ohlson drove by them, yelling racial slurs at them and making obscene gestures. Ohlson turned around and drove past them again, speeding and braking while continuing to yell racial slurs and make obscene gestures. Ohlson then drove out of sight and was gone for approximately five minutes.
¶ 3 When Ohlson returned, L.F. and D.L. were still on the sidewalk. L.F. testified that Ohlson drove toward them, over the curb, and onto the sidewalk where they were standing, causing the two of them to "jump out of the way." I Verbatim Report of Proceedings (VRP) at 66. D.L. said, "`look out,'" and L.F. turned to see Ohlson's car very close to them, before they jumped out of its way. I VRP at 68. L.F. described Ohlson as "tr[ying] to run us over," going "really fast . . . like 45 [miles per hour]," and she stated that she was scared. I VRP at 66, 67. Robert Klose, an eyewitness standing across the street, testified that he saw Ohlson driving up onto the sidewalk toward L.F. and D.L., who had to jump out of the way. Klose testified he yelled, "`[h]ey, that guy tried to hit you.'" II VRP at 112.
¶ 4 L.F. called 911. Bremerton Police Officer Crystal Gray received the report of "a *1275 vehicle speeding . . . trying to hit some juveniles" and made an emergency response using lights and siren. I VRP at 90. She arrived at the scene within five minutes of the call. Officer Gray testified that L.F. and D.L. were "pretty upset" and "pretty shaken up." I VRP at 91. At that point in Officer Gray's testimony, Ohlson made an objection to the admission of D.L.'s out-of-court statements, which the trial court overruled.
¶ 5 Officer Gray then testified that L.F. and D.L. told her that while they were standing on the sidewalk waiting for a ride,
a vehicle . . . had gone by and flipped them off and, I quote "called them [racial slurs]" and sped off. The vehicle then came back around and actually swerved up on to the curb trying to hit them. . . . They had to literally jump out of the way so that they were not hit. This continued, they said, at least four times, where the car went back and forth in front of them, calling them racial names.
I VRP at 92-93. A second Bremerton police officer also made an emergency response to L.F.'s 911 call, arriving after Officer Gray. That officer drove around in the immediate area looking for the suspect vehicle while Officer Gray made initial inquiries of L.F. and D.L.
¶ 6 Ohlson was arrested at his home several hours after the incident. The arresting officer testified that Ohlson admitted to yelling racial slurs and making gestures at L.F. and D.L. while driving past them multiple times, as well as to driving "kind of recklessly to scare [L.F. and D.L.]," at one point coming within "about five feet from [D.L.]." I VRP at 84-85. Ohlson also testified at trial. He admitted to using racial slurs but stated that he had not intended to scare L.F. and D.L. Rather, Ohlson explained, he was in a "fit of rage" because he had lied to his wife about using drugs. II VRP at 124.
¶ 7 The jury found Ohlson guilty of two counts of assault in the second degree and not guilty of malicious harassment. Ohlson appealed his conviction on multiple grounds, and the Court of Appeals affirmed. State v. Ohlson, 131 Wash.App. 71, 125 P.3d 990 (2005). In the published portion of its opinion, the court upheld the trial court's admission of D.L.'s out-of-court statements as excited utterances. Id. at 78, ¶ 19, 125 P.3d 990. Additionally, in adopting a per se rule that excited utterances cannot be testimonial under Crawford, the court rejected Ohlson's claim that his Sixth Amendment right to confrontation was violated by the admission of D.L.'s statements. Id. at 79-84, ¶¶ 20-38, 125 P.3d 990. We granted Ohlson's petition for review on the excited utterance and confrontation clause issues. State v. Ohlson, 158 Wash.2d 1001, 143 P.3d 828 (2006).

II. ISSUES
¶ 8 A. Did the trial court abuse its discretion by admitting as excited utterances D.L.'s statements to Officer Gray?
¶ 9 B. Was Ohlson's Sixth Amendment right to confrontation violated by admitting D.L.'s out-of-court statements?

III. ANALYSIS
A. Excited utterance
¶ 10 Ohlson contends that the trial court erred when it admitted as excited utterances D.L.'s out-of-court statements to Officer Gray. Ohlson argues that the evidence was insufficient to establish that D.L. perceived a startling event and spoke under the stress of excitement of that event, two of the requirements of ER 803(a)(2), the excited utterance exception. We disagree.
¶ 11 This court reviews for abuse of discretion a trial court's decision to admit a hearsay statement as an excited utterance. State v. Woods, 143 Wash.2d 561, 597, 23 P.3d 1046 (2001); State v. Strauss, 119 Wash.2d 401, 417, 832 P.2d 78 (1992). We will not reverse the trial court's decision "unless we believe that no reasonable judge would have made the same ruling." Woods, 143 Wash.2d at 595-96, 23 P.3d 1046.
¶ 12 ER 803(a)(2) provides that a statement is not excluded as hearsay if it is an excited utterance "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The excited utterance exception does not require a showing *1276 that the declarant is unavailable as a witness. State v. Chapin, 118 Wash.2d 681, 686, 826 P.2d 194 (1992). This court has recognized that the proponent of excited utterance evidence must satisfy three "closely connected requirements" that (1) a startling event or condition occurred, (2) the declarant made the statement while under the stress of excitement of the startling event or condition, and (3) the statement related to the startling event or condition. Woods, 143 Wash.2d at 597, 23 P.3d 1046; Chapin, 118 Wash.2d at 686, 826 P.2d 194. Ohlson contends that the evidence was insufficient to establish the first and second requirements of the excited utterance exception.
¶ 13 Ohlson argues that the first requirement was not met because "no testimony was provided directly from D.L. to indicate that a startling event occurred from his perspective." Appellant's Pet. to Review at 5 (emphasis added). But, as the Court of Appeals correctly stated, while the focus is on the declarant's perception in analyzing whether a startling event has occurred, "the declarant need not testify regarding his perception of the event in order to establish this requirement." Ohlson, 131 Wash.App. at 77, ¶ 16, 125 P.3d 990. Indeed, a statement may be admitted as an excited utterance even if the declarant recants or testifies at trial that the event never occurred. See State v. Williamson, 100 Wash.App. 248, 258-59, 996 P.2d 1097 (2000) (statements by victim describing her kidnapping and attempted murder held admissible as excited utterances, even though victim later recanted and refused to testify against defendant); State v. Briscoeray, 95 Wash.App. 167, 173-74, 974 P.2d 912 (1999) (victim's statement describing assault by boyfriend held admissible as excited utterance, even though victim testified at trial that assault never occurred).
¶ 14 Here the evidence amply supports a finding that D.L. perceived a startling event, the assault, to have occurred. L.F. testified that Ohlson yelled racial slurs at her and D.L., then drove onto the sidewalk toward where they were standing. L.F. testified that it was D.L. who said, "`look out,'" as Ohlson's car came very close to them. I VRP at 68. Both L.F. and eyewitness Klose testified that L.F. and D.L. then had to jump out of the way of Ohlson's car to avoid being hit. This evidence is sufficient to establish that D.L. perceived the assault to be a startling event.
¶ 15 As for the second requirement, Ohlson's argument that no evidence indicated that D.L. was under the influence of the startling event when he made his statements to Officer Gray also fails. We have previously upheld the admission of statements as excited utterances where the statements were made by alleged victims to a police officer "just minutes" after an alleged robbery, the officer testified that the declarants "were visibly shaken and excited" when they made the statements, and the statements "appear[ed] to have been spontaneous." State v. Hardy, 133 Wash.2d 701, 714, 946 P.2d 1175 (1997). Here, Officer Gray testified that she spoke with L.F. and D.L. approximately five minutes after the assault occurred and that L.F. and D.L. were "pretty upset" and "pretty shaken up." I VRP at 91. L.F. and D.L. described the incident to Officer Gray in a spontaneous recitation of the facts.
¶ 16 The trial court did not abuse its discretion when it admitted D.L.'s out-of-court statements as excited utterances.
B. Sixth Amendment right to confrontation
¶ 17 In the alternative, Ohlson argues that even if D.L.'s out-of-court statements to Officer Gray were properly admitted as excited utterances, their admission violated his Sixth Amendment right to confrontation[1] under Crawford and Davis. The State responds that admitting D.L.'s statements did not violate Ohlson's right to confrontation because the statements were not testimonial. We agree.
*1277 1. The confrontation clause after Crawford and Davis
¶ 18 The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. In its watershed 2004 decision, Crawford, the United States Supreme Court reformulated the analysis of confrontation clause claims. Crawford explained that the confrontation clause "bars `admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" Davis, 126 S.Ct. at 2273 (quoting Crawford, 541 U.S. at 53-54, 124 S.Ct. 1354).
¶ 19 While Crawford "le[ft] for another day any effort to spell out a comprehensive definition of `testimonial,'" 541 U.S. at 68, 124 S.Ct. 1354, the Court did identify that a "core class of `testimonial' statements exist." Id. at 51, 124 S.Ct. 1354. Without selecting among them, the Court provided three possible formulations of that core class, including "`statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" Id. at 52, 124 S.Ct. 1354 (quoting Br. for Nat'l Ass'n of Criminal Defense Lawyers et al. as Amici Curiae at 3). The Court also stated that "[s]tatements taken by police officers in the course of interrogations" were within the core class. Id. at 52, 124 S.Ct. 1354. The Court did not define "interrogation," beyond specifically indicating that it was using the term "in its colloquial, rather than any technical legal, sense." Id. at 53 n. 4, 124 S.Ct. 1354.
¶ 20 Two years later, the Court elaborated on "which police interrogations produce testimony" in the consolidated cases of Davis v. Washington (statements to law enforcement officers during a 911 call[2]) and Hammon v. Indiana (statements to law enforcement officers at a crime scene). Davis, 126 S.Ct. at 2273. The Court stated:
Without attempting to produce an exhaustive classification of all conceivable statementsor even all conceivable statements in response to police interrogationas either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
Id. at 2273-74. However, the Court stressed, "of course . . . it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." Id. at 2274 n. 1.
¶ 21 The Davis primary purpose test is not focused on the reasonable belief of an objective declarant, as was one definition of "testimonial" endorsed in Crawford. See 541 U.S. at 52, 124 S.Ct. 1354. Whether statements are testimonial or nontestimonial "is essentially beyond police control. . . . [T]estimonial statements are what they are." Davis, 126 S.Ct. at 2279 n. 6. Ultimately, with respect to police interrogations, the question presented by the confrontation clause is "whether, objectively considered, the interrogation that took place . . . produced testimonial statements." Id. at 2276.
¶ 22 Thus, the primary purpose test requires courts to make an objective appraisal of the interrogation itself. In applying the test to the facts of Davis and Hammon, the Court discussed four characteristics of the circumstances in which the statements were made: (1) the timing relative to the events discussed, (2) the threat of harm posed by the situation, (3) the need for information to resolve a present emergency, and (4) the formality of the interrogation.
¶ 23 In Davis, proper, the Court determined that Michelle McCottry's statements *1278 to a 911 operator during a domestic disturbance, including McCottry's identification of her assailant by name in response to the operator's questions, were not testimonial. First, with respect to timing, McCottry was "speaking about events as they were actually happening, rather than `describ[ing] past events'" as had the declarant in Crawford, whose interrogation "took place hours after the events she described had occurred." Id. (alteration in original) (quoting Lilly v. Virginia, 527 U.S. 116, 137, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality opinion)).
¶ 24 Second, as to the threat of harm, "any reasonable listener would recognize that McCottry (unlike [the declarant in Crawford]) was facing an ongoing emergency." Id. McCottry's 911 call was "plainly a call for help against bona fide physical threat." Id.
¶ 25 Third, objectively viewing "the nature of what was asked and answered[,] . . . the elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn (as in Crawford) what had happened in the past." Id. Resolving the present emergency even encompassed establishing the assailant's identity because it was important for the responding officers to know whether they might "be encountering a violent felon." Id.
¶ 26 Finally, as to the level of formality, unlike the declarant in Crawford who "was responding calmly, at the station house, to a series of questions," McCottry provided her "frantic answers . . . in an environment that was not tranquil, or even . . . safe." Id. at 2277. Considering all of the above, the Court concluded that "the circumstances of McCottry's interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency," rendering the resulting statements nontestimonial. Id.
¶ 27 In Hammon, the Court reached the opposite result, holding that Amy Hammon's statements to the police officer who interviewed her after responding to a domestic disturbance call were testimonial. With respect to timing, Hammon made the statements in question "some time after the events described were over." Id. at 2278. "When the officer questioned [Hammon] for the second time, and elicited the challenged statements, he was not seeking to determine (as in Davis) `what is happening,' but rather `what happened.'" Id.
¶ 28 Considering the threat of harm and the need for information to resolve a present emergency, the Court emphasized that when Hammon made her statements, "[t]here was no emergency in progress." Id. In fact, when the officers first arrived, Hammon "told them that things were fine" and that "there was no immediate threat to her person." Id. During the later interrogation, the police "actively separated" Hammon and her husband and "forcibly prevented [him] from participating in the interrogation." Id.
¶ 29 Finally, while "the Crawford interrogation was more formal," Hammon's interrogation was "formal enough." Id. The questioning "was conducted in a separate room, away from [Hammon's] husband," and Hammon's statements "deliberately recounted, in response to [that] questioning, how potentially criminal past events began and progressed." Id. The Court concluded, "[i]t is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct," rendering the resulting statements testimonial. Id.
¶ 30 The Court was careful to point out, however, that the determining factormaking the statements in Hammon testimonial and those in Davis nontestimonialwas not the fact that in Hammon the police had arrived on the scene, while in Davis the interrogation was by phone. Id. at 2279. Although the Court "necessarily reject[ed] the . . . implication that virtually any `initial inquiries' at the crime scene will not be testimonial," it emphasized "we do not hold the oppositethat no questions at the scene will yield nontestimonial answers." Id. (quoting Hammon v. Indiana, 829 N.E.2d 444, 453, 457 (Ind.2005)). By way of explanation, the Court continued,
"[o]fficers called to investigate . . . need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim." Such exigencies may *1279 often mean that "initial inquiries" produce nontestimonial statements. But in cases like [Hammon], where [Hammon's] statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were "initial inquiries" is immaterial.
Id. (first emphasis added) (first two alterations in original) (citation omitted) (quoting Hiibel v. Sixth Judicial Dist. Ct. of Nev., 542 U.S. 177, 186, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004)).
¶ 31 The concurrence suggests that whether a statement is "in the past or present tense" is indicative of its testimonial or nontestimonial nature. Concurrence at 1282. However, this simple grammatical analysis is inconsistent with the Court's emphasis that initial inquiries at a crime scene enabling officers to "`assess the situation, the threat to their own safety, and possible danger to the potential victim'" "may . . . produce nontestimonial statements." Id. (quoting Hiibel, 542 U.S. at 186, 124 S.Ct. 2451). Information essential to assessing a situation will necessarily sometimes include recitations of events that occurred in the past, if only by a matter of minutes. Furthermore, it is worth considering that, while McCottry's nontestimonial statements in Davis were phrased in the present tense, she was, most likely, technically describing events that had already occurred. Certainly there is no indication that she was being assaulted as she spoke with the 911 operator. Thus, Davis supports a more nuanced approach when considering the timing of a statement than merely noting whether a declarant phrased his or her statement using past or present tense.
¶ 32 The concurrence also suggests that "the presence or absence of the perpetrator at the scene may indicate whether an emergency is ongoing and, by extension, whether the victim's statements are testimonial." Concurrence at 5. While the perpetrator's location and status undoubtedly contribute to whether an ongoing emergency exists, Davis no more supports a bright line "perpetrator present or absent" rule than it does the aforementioned "declarant used past tense or present tense" rule. The perpetrators were at the scenes in both Davis and Hammon, but the Davis statements were nontestimonial and the Hammon statements testimonial. What distinguishes the two situations is that in Davis, the perpetrator posed a threat to the declarant, while in Hammon, the perpetrator was under police control, "actively separated" from the declarant. Davis, 126 S.Ct. at 2278. Thus, the critical consideration is not whether the perpetrator is or is not at the scene, but rather whether the perpetrator poses a threat of harm, thereby contributing to an on-going emergency.
¶ 33 To summarize, Davis announced that whether statements made during police interrogation are testimonial or nontestimonial is discerned by objectively determining the primary purpose of the interrogation. If circumstances objectively indicate that the primary purpose is to enable police assistance to meet an ongoing emergency, the elicited statements are nontestimonial. If circumstances indicate that the primary purpose is to establish or prove past events, the elicited statements are testimonial. Characteristics to consider when objectively assessing the circumstances of the interrogation include the timing of the statements, the threat of harm, the need for information to resolve a present emergency, and the formality of the interrogation. With this background in mind, we turn to examining the statements Ohlson challenges.
2. D.L.'s out-of-court statements
¶ 34 Ohlson claims that admission of D.L.'s out-of-court statements to Officer Gray violated his Sixth Amendment right to confrontation. The confrontation clause is violated by admission of testimonial out-of-court statements when the declarant does not testify at trial unless the declarant is unavailable to testify and the defendant has had a prior opportunity to cross-examine the declarant. Crawford, 541 U.S. at 53-54, 124 S.Ct. 1354. It is undisputed that D.L. did not testify at trial and that Ohlson had no prior opportunity to cross-examine D.L. regarding the challenged statements. Thus, whether the confrontation clause bars admission of D.L.'s out-of-court statements turns *1280 exclusively on whether D.L.'s statements were testimonial.
¶ 35 The Court of Appeals, without the benefit of Davis, "adopt[ed] a per se rule and h[e]ld that excited utterances cannot be testimonial under Crawford." Ohlson, 131 Wash.App. at 84, ¶ 37, 125 P.3d 990. The court reasoned that since an excited utterance requires the declarant to be "`still under the influence of the event to the extent that [the] statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment,'" id. at 83, ¶ 37, 125 P.3d 990 (alteration in original) (internal quotation marks omitted) (quoting State v. Brown, 127 Wash.2d 749, 758-59, 903 P.2d 459 (1995)), "[i]t is not reasonable to regard an excited utterance as `bearing witness,' such that the declarant would know that it would be used in a later prosecution." Id. at 82, ¶ 32, 125 P.3d 990. Therefore, the court reasoned, "excited utterances are not testimonial by their very nature." Id.
¶ 36 In light of Davis, the Court of Appeals' per se rule is no longer tenable. Davis indicated that the objectively determined primary purpose of a police interrogation is decisive in evaluating whether a resulting statement is testimonial. 126 S.Ct. at 2276-79. Davis also rejected "the Indiana Supreme Court's implication [in Hammon v. State] that virtually any `initial inquiries' at the crime scene will not be testimonial," while making clear that it was "not hold[ing] the oppositethat no questions at the scene will yield nontestimonial answers." Id. at 2279.
¶ 37 The reasoning of Davis and its focus on the primary purpose for which statements were obtained seem to have implicitly foreclosed any per se rule that excited utterances cannot be testimonial. Certainly, applying Davis, we can "conceive of a hybrid situation where a predominantly excited utterance might contain testimonial elements." Ohlson, 131 Wash.App. at 84, ¶ 42, 125 P.3d 990 (Hunt, J., concurring). We therefore reverse the Court of Appeals decision to the extent that it announced a per se rule that excited utterances cannot be testimonial.
¶ 38 However, applying Davis to the facts presented here, we nonetheless conclude that D.L.'s statements in response to Officer Gray's interrogation were nontestimonial.[3] The circumstances of Officer Gray's interrogation of D.L. objectively indicate that the primary purpose of that interrogation was to enable police assistance to meet an ongoing emergency.
¶ 39 First, with respect to timing, D.L.'s statements to Officer Gray were made within minutes of the assault. L.F. called 911 immediately after the assault and within five minutes of the call Officer Gray was on the scene making her initial inquiries. This is not like Hammon, where the statements in question were made "some time after the events described were over," during the officer's second questioning of the declarant. Davis, 126 S.Ct. at 2278. While D.L. was not "speaking about events as they were actually happening," the statements were made contemporaneously with the events described. Id. at 2276. In timing, D.L.'s statements are not unlike McCottry speaking to the 911 operator contemporaneously with the domestic dispute.
¶ 40 Considering the threat of harm, Ohlson had previously left the scene, only to return five minutes later and escalate his behavior from yelling to physically assaulting L.F. and D.L. Objectively viewing the course of events, there is no way to know, and every reason to believe, that Ohlson might return a third time and perhaps escalate his behavior even more. Unlike Hammon, D.L. did not greet Officer Gray with the message that "things were fine" and "there was no immediate threat to [his] person." Id. at 2278. Also, unlike Hammon, the police could not "actively separate[ ]" Ohlson from D.L., and "forcibly prevent[ ]" Ohlson from harming *1281 D.L.Ohlson's identity and location were unknown. Id. Rather, like McCottry, D.L.'s statements to Officer Gray were "a call for help against bona fide physical threat." Id. at 2276.
¶ 41 Third, D.L.'s statements to Officer Gray were necessary to resolve a present emergency. When Officer Gray arrived on the scene, all that was known about the situation was what the 911 call reporteda speeding vehicle was trying to hit some juveniles. The immediate top priority was to determine whether there was ongoing danger to those juveniles or any threat to the community or herself and her fellow officers. Officer Gray's initial inquiries sought information essential to determining whether the situation presented such ongoing dangers or threats. At least until Officer Gray completed her initial triage of the situation, which in this case necessitated the information obtained from L.F. and D.L., the situation presented an ongoing emergency.
¶ 42 Finally, as to the level of formality, the circumstances of Officer Gray's interrogation of D.L. were far less formal than those in Hammon, in which the interrogation was "conducted in a separate room" and Hammon "deliberately recounted, in response to . . . questioning, how potentially criminal past events began and progressed." Id. D.L.'s interrogation was conducted in an unsecured situation that "was not tranquil, or even . . . safe." Id. at 2277.
¶ 43 For the above reasons, we conclude that the primary purpose of Officer Gray's interrogation of D.L. was to enable police assistance to meet an ongoing emergency. As such, D.L.'s statements to Officer Gray were nontestimonial.[4] Therefore, the trial court's admission of D.L.'s out-of-court statements did not violate Ohlson's Sixth Amendment right to confrontation.

IV. CONCLUSION
¶ 44 We hold that the trial court did not abuse its discretion by admitting D.L.'s statements as excited utterances. We reject the Court of Appeals' per se rule that excited utterances can never be testimonial but hold that, under the facts presented here, D.L.'s statements were nontestimonial and, thus, their admission did not violate Ohlson's right to confrontation. We affirm the Court of Appeals in part and reverse in part.
WE CONCUR: Chief Justice GERRY L. ALEXANDER, CHARLES W. JOHNSON, SUSAN OWENS, JAMES M. JOHNSON, BOBBE J. BRIDGE, Justices.
CHAMBERS, J. (concurring).
¶ 45 The United States Supreme Court has offered little guidance to courts seeking to determine whether statements made during police interrogation under emergency/postemergency conditions are testimonial for purposes of Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Until the Supreme Court gives us greater guidance as to which statements are testimonial and subject to the confrontation clause, trial courts should be cautious in admitting such statements. Prudence requires that we examine what we do know from Crawford and now Davis v. Washington, ___ U.S. ___, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), and to establish an analytical framework for courts facing this difficult question in the future.
¶ 46 I would hold that D.L.'s statements were testimonial under Davis and their admittance was improper. I concur in the result reached by the majority because the error was harmless.

I
¶ 47 For purposes of confrontation clause analysis, the Supreme Court seems to have *1282 shifted the focus from the declarant's purpose in Crawford to the purpose of the interrogation in Davis. In Crawford, the Court included "[s]tatements taken by police officers in the course of interrogations" in the core class of testimonial statements. Crawford, 541 U.S. at 52, 124 S.Ct. 1354. To determine whether statements qualified as testimonial, the Court focused on the intention or reasonable belief of the declarant, concluding statements are testimonial when "`made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" Id. (emphasis added) (quoting Br. for Nat'l Ass'n of Criminal Defense Lawyers et al. as Amici Curiae 3). As the Sixth Circuit Court of Appeals summarized, under Crawford:
The proper inquiry, then, is whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.
United States v. Cromer, 389 F.3d 662, 675 (6th Cir.2004) (emphasis added).
¶ 48 In Davis, the Court shifted its focus from the reasonable understanding of the declarant to the purpose of the interrogation. The Court held:
Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
Davis, 126 S.Ct. at 2273-74 (emphasis added).
¶ 49 Thus, under Davis, courts are "charged with divining the `primary purpose' of police interrogations." Id. at 2280 (Thomas, J., concurring in part, dissenting in part). Unfortunately, the opinion offers lower courts little guidance on how to carry out such a taskone which increases in complexity when an interrogation takes place under emergency/postemergency conditions. In his partial dissent, Justice Thomas criticized the Davis Court's test as "unpredictable," opining that "[i]n many, if not most, cases where police respond to a report of a crime, whether pursuant to a 911 call from the victim or otherwise, the purposes of an interrogation, viewed from the perspective of the police, are both to respond to the emergency situation and to gather evidence." Id. at 2283 (Thomas, J., concurring in part, dissenting in part). He concluded, "[a]ssigning one of these two `largely unverifiable motives,' primacy requires constructing a hierarchy of purpose that will rarely be presentand is not reliably discernable. It will inevitably be, quite simply, an exercise in fiction." Id. (quoting New York v. Quarles, 467 U.S. 649, 656, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984)).
¶ 50 I too fear the language in Davis is flexible enough to accommodate nearly any outcome. That said, Davis does provide some help in determining the "purpose" of an interrogation conducted under emergency/postemergency circumstances.

II
¶ 51 To determine whether statements are testimonial post-Davis, the trial judge must consider such factors as whether the statements are in the past or present tense, the proximity of the perpetrator to the declarant, and the formality of the interrogation. Davis, 126 S.Ct. at 2276-78. This list of factors is not necessarily exclusive; nor does any one factor necessarily determine the purpose of the interrogation in every case.
A. PAST OR PRESENT TENSE
¶ 52 The timing of the officer's interrogation is the foremost and most useful factor in determining whether a given statement is testimonial. In Davis, the Court concluded Michelle McCottry's statements were nontestimonial as they were made while she was alone, unprotected by police, in immediate danger, and "facing an ongoing emergency." Id. at 2276 (emphasis added). The Davis *1283 Court emphasized the fact that "McCottry was speaking about events as they were actually happening, rather than `describing past events,'" and therefore concluded the primary purpose of McCottry's interrogation was to "enable police assistance to meet an ongoing emergency." Id. at 2276-77 (quoting Lilly v. Virginia, 527 U.S. 116, 137, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999)); see also id. at 2279 ("[McCottry] was seeking aid, not telling a story about the past" and her "present-tense statements showed immediacy.").
¶ 53 In contrast, the facts in the consolidated case, Hammon v. Indiana, convinced the Court that Amy Hammon's statements were testimonial because they were made after the emergency had ended. The Court explained, "the interrogating officer testified that he heard no arguments or crashing and saw no one throw or break anything" and "[w]hen the officers first arrived, Amy told them that things were fine, and there was no immediate threat to her person." Id. at 2278 (citation omitted). Accordingly, the Court concluded the emergency had ceased and the interrogating officer "was not seeking to determine (as in Davis) `what is happening,' but rather `what happened.'" Id. (emphasis added).[1]
B. PROXIMITY OF THE PERPETRATOR TO THE DECLARANT
¶ 54 The Davis Court suggested the presence or absence of the perpetrator at the scene may indicate whether an emergency is ongoing and, by extension, whether a victim's statements are testimonial. Proximity or presence is a more nuanced consideration than simply whether the perpetrator is located at the same address as the declarant. The fact that both Hammon and the declarant in Crawford "were actively separated from the defendant" during their interrogations played a significant role in the Court's determinations that both interrogations yielded testimonial responses. Id. at 2278. The Court emphasized the significance of the proximity of the perpetrator at the time a particular statement was made while explaining that interrogations, which initially elicit nontestimonial responses, may evolve into conversations yielding testimonial statements. As the Court observed in Davis:
after the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (when Davis drove away from the premises). The operator then told McCottry to be quiet, and proceeded to pose a battery of questions. It could readily be maintained that, from that point on, McCottry's statements were testimonial.
Id. at 2277 (emphasis added).
C. FORMALITY OF THE INTERROGATION
¶ 55 The "formality" of the interrogation is another factor considered by the Davis Court. Comparing the interrogation in Crawford to McCottry's 911 phone call, the Court observed:
the difference in the level of formality between the two interviews is striking. Crawford was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even . . . safe.
Id. at 2276-77. In contrast to the chaos surrounding McCottry's interrogation, the situation in Hammon allowed for a more organized or "formal"[2] interrogation to take place. Hammon told arriving officers that "things were fine" and there was no "immediate threat to her person." Id. at 2278. Her interview was "conducted in a separate room" away from the perpetrator and her statements "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed." *1284 Id. at 2278. The Court concluded, "[s]uch statements under official interrogation are an obvious substitute for live testimony because they do precisely what a witness does on direct examination." Id. (emphasis in original).

III
¶ 56 With these factors in mind, I turn to the present case. James Ohlson, the alleged perpetrator, had left the scene by the time Officer Gray arrived. Although shaken, the declarant, D.L., was in no immediate danger when he made his statements to Officer Gray. He was, in fact, protected by the presence of law enforcement and separated from the perpetrator at all times throughout the interrogation. Officer Gray's testimony indicates D.L. used the past tense to describe what had occurred prior to the officer's arrival. See I Verbatim Report of Proceedings at 91 ("I spoke with both of them, and they told me what happened." (emphasis added)).
¶ 57 The temporal factor is the single most important factor here. D.L. was describing events in the past tense, not describing events which were presently happening. Because Ohlson had left the scene and the police were present to protect D.L., there was sufficient separation between the perpetrator and the declarant to suggest that the emergency had abated and D.L. was providing information to the police to assist in apprehending and prosecuting the perpetrator.
¶ 58 The interrogation before us is not particularly formal; however, police often conduct investigations in the field with the understanding between the interrogator and the declarant that the purpose of the questioning is to assist the apprehension and prosecution of the wrongdoer rather than resolve the ongoing emergency. I conclude that the statements made by D.L. to the police at the scene were testimonial.

IV
¶ 59 The majority concludes the emergency was ongoing because Ohlson was still at large and "pose[d] a threat of harm." Majority at 1279. Thus, the majority concludes the emergency is still in progress when police arrive at the scene. But whether a perpetrator is "at large" was not a factor considered by the Davis Court, and the majority's emphasis on such a factor is problematic as many perpetrators will indeed be "at large" while police are questioning witnesses during an investigation.
¶ 60 The majority also concludes that an emergency was ongoing because, upon arrival, the police needed more information to determine whether the danger was ongoing. Again, I fear that this will nearly always be the case. Therefore, I would not conclude that statements to the police are nontestimonial merely because more crime or violence could possibly occur.
¶ 61 Most critically, I respectfully submit that the majority does not adequately distinguish Hammon from the case before us. In Hammon, the Supreme Court determined that by time the police arrived on the scene the emergency had ended even though Hammon appeared "somewhat frightened" and there was evidence in the home of a very recent and violent physical altercation between Hammon and her husband. 126 S.Ct. at 2272 (internal quotation marks omitted). Hammond's husband was present in the house, but she was protected by the police at the time. These facts are analogous to those in Hammon and distinguishable from those in Davis where McCottry was alone, unprotected by law enforcement, and "in immediate danger" from her husband. Id. at 2279. Here, Ohlson had left the scene by the time police arrived, D.L. was in no immediate danger, and the record indicates he used the past tense to describe what had occurred prior to the arrival of law enforcement. See id. at 2279 ("McCottry's present-tense statements showed immediacy; [Hammond]'s narrative of past events was delivered at some remove in time from the danger she described."); id. at 2276 (statement is likely nontestimonial when it is "necessary . . . to resolve the present emergency, rather than simply to learn . . . what had happened in the past" (second emphasis added)). As such, D.L.'s recitation of recent, yet past events cannot rightly be construed as a "call for help," as there was no "present emergency" in need of resolution. Id. at 2276.
*1285 ¶ 62 The fact that D.L. described past events, the fact that the perpetrator had left the scene and the police were present to protect D.L., and the formality of the police officer's securing information for the purpose of apprehending and prosecuting the perpetrator all suggest D.L.'s statements were testimonial. As such, admittance of the statements violated Ohlson's right to confrontation under the Sixth Amendment. I concur in the result of the majority, however, because the admittance was harmless in light of the overwhelming evidence of Ohlson's guilt at trial. See State v. Guloy, 104 Wash.2d 412, 705 P.2d 1182 (1985).
I CONCUR: Justice BARBARA A. MADSEN.
NOTES
[1] Article I, section 22 of the Washington Constitution also guarantees criminal defendants the right to confront and cross-examine witnesses against them. However, as Ohlson made no arguments based on the state constitution, we do not address the state constitution here. See State v. Wheeler, 145 Wash.2d 116, 124, 34 P.3d 799 (2001) (declining to address potential claim under state constitution where parties failed to argue or brief the issues).
[2] For the purposes of its decision, the Court assumed, without deciding, that 911 operators are law enforcement officers. Davis, 126 S.Ct. at 2274 n. 2.
[3] The Court of Appeals reasoned that D.L.'s statements were not given in the course of police interrogation because "Officer Gray's minimal questioning was not an `interrogation' as Crawford contemplated." Ohlson, 131 Wash.App. at 80, ¶ 27, 125 P.3d 990. However, Davis clarifies that initial police inquiries at a crime scene, like those made by Officer Gray, are included within the definition of police interrogation as contemplated by Crawford. Davis, 126 S.Ct. at 2274 n. 1.
[4] The State further argues that even if we were to determine that D.L.'s statements were testimonial, the error in admitting them would be harmless. We agree. A violation of the confrontation clause is subject to harmless error analysis, using "`the "overwhelming untainted evidence" test.'" State v. Davis, 154 Wash.2d 291, 305, ¶ 37, 111 P.3d 844 (2005), aff'd sub nom. Davis v. Washington, ___ U.S. ___, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (quoting State v. Smith, 148 Wash.2d 122, 139, 59 P.3d 74 (2002)). Here, any error in admitting D.L.'s out-of-court statements to Officer Gray would be harmless. The untainted evidenceincluding L.F.'s testimony, Klose's eyewitness testimony, and Ohlson's own statements, both at arrest and at trialis overwhelming and necessarily leads to a finding of guilt beyond a reasonable doubt.
[1] While I can imagine situations where verb tense would not be determinative or even helpful (for example, if the declarant is a nonnative speaker or is using language in an unusual way), that does not negate the usefulness of this factor in general or in this case.
[2] The United States Supreme Court does not appear to employ a narrow definition of "formal." It certainly does not suggest that for an interrogation to qualify as "formal" it must take place at a station house and the declarant's answers must be in response to "`structured police questioning.'" Id. at 2277 (quoting Crawford, 541 U.S. at 53 n. 4, 124 S.Ct. 1354).