IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Respondent,<br><br>   v.<br><br>SETH C. TAPAKA,<br><br>               Appellant. | No. 80690-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Seth Tapaka appeals his convictions for robbery in the first degree and unlawful possession of a firearm in the first degree. Tapaka's right to confront the witnesses against him was violated when testimonial statements in the robbery victim's 911 calls were admitted at trial, but the error was harmless in light of the overwhelming evidence against him. Tapaka's ineffective assistance of counsel claim fails because he does not show any prejudice stemming from the allegedly deficient performance of counsel. We accept the State's concession that the trial court erred by imposing the fees of community custody supervision on Tapaka. We affirm Tapaka's convictions and remand to the trial court to strike the community custody supervision fees.

FACTS

Early in the morning of November 24, 2018, around 4:20 a.m., a Circle K convenience store clerk in south Seattle called 911 to report that he had just

Citations and pin cites are based on the Westlaw online version of the cited material.

been robbed at the store. He described the robber as a white man, 25 or 30 years old, and wearing a white jacket. He said the man was armed with a gun and took money and cigarettes.

An hour later, around 5:20 a.m., a 7-Eleven convenience store clerk in West Seattle called 911 to report a similar robbery. He said he had just been robbed at the store by a white man in his twenties wearing a white jacket and armed with a gun who took money and cigarettes.

Seattle Police Department (SPD) Detective Michael Magan, along with others from the SPD, responded to both convenience stores. He acquired the surveillance videos from both stores and canvassed the surrounding neighborhoods for additional surveillance videos. Based on the surveillance videos he obtained from the area surrounding the 7-Eleven, he was able to identify a suspect vehicle, which was a 1996-98 "dark in color" Honda 4-door sedan with a "black-colored rim" on the front right tire and a "two-toned" gold and silver rim on the right rear tire.

On November 27, 2018, Detective Magan spotted a vehicle matching the suspect vehicle description—especially noting the distinctive tire rims—while he was canvassing the area surrounding the 7-Eleven. Police pulled the vehicle over and arrested both people in the vehicle subsequently identified as Seth Tapaka and his girlfriend Florence Lyons. Police took Tapaka and Lyons to the SPD headquarters. Detective Magan, along with another detective, interviewed Lyons and Tapaka separately. The vehicle was impounded and secured at the SPD processing room.

The State charged Tapaka with two counts of robbery in the first degree, one count for the Circle K robbery and one count for the 7-Eleven robbery, and alleged that Tapaka was armed with a firearm at the time he committed both robberies. The State also charged Tapaka with unlawful possession of a firearm in the first degree.

During a jury trial, the State introduced the audio recordings of both clerks' 911 calls, the surveillance videos from the robberies at both the Circle K and the 7-Eleven, still photographs taken from surveillance videos, a redacted video recording of the detectives' interview with Tapaka at SPD headquarters, photographs of cigarettes and JUUL products found in Tapaka's car after it was impounded, and a gun that the police later discovered at Tapaka's mother's house. Lyons testified that on the morning of the robberies, while they were together in Tapaka's car, Tapaka talked about robbing a store. He left the car with a gun and came back with cigarettes, JUUL products, and money and told her, "I robbed the store." Tapaka did not testify at trial and neither did either of the store clerks who called 911.

On October 3, 2019, the jury found Tapaka guilty as charged, including both firearm enhancements.

Tapaka appeals.

DISCUSSION

Admission of Calls to 911

Tapaka argues that admission of both store clerks' calls to 911 violated his right to confront the witnesses against him because their statements were

3

testimonial, and neither store clerk testified at trial. We agree that the clerks'
statements on the 911 calls were testimonial but hold that any error was
harmless in light of the overwhelming evidence against Tapaka.

The confrontation clause of the Sixth Amendment states, "In all criminal
prosecutions, the accused shall enjoy the right . . . to be confronted with the
witnesses against him." U.S. CONST. amend. VI. See also CONST. art. I, § 22
(accused shall have the right to meet the "witnesses against him" face to face).
The confrontation clause bars the admission of "testimonial" hearsay unless the
declarant is unavailable to testify and the defendant had a prior opportunity for
cross-examination. Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct.
1354, 158 L. Ed. 2d 177 (2004). We review de novo an alleged violation of the
confrontation clause. State v. Koslowski, 166 Wn.2d 409, 417, 209 P.3d 479
(2009).

In Davis v. Washington, 547 U.S. 813, 814, 126 S. Ct. 2266, 165 L. Ed. 2d
224 (2006), the United States Supreme Court set forth the primary purpose test
to determine if statements are testimonial or not.

> Statements are nontestimonial when made in the course of police
> interrogation under circumstances objectively indicating that the
> primary purpose of the interrogation is to enable police assistance
> to meet an ongoing emergency. They are testimonial when the
> circumstances objectively indicate that there is no such ongoing
> emergency, and that the primary purpose of the interrogation is to
> establish or prove past events potentially relevant to later criminal
> prosecution.

Davis, 547 U.S. at 822 (emphasis added).

4

The Davis court adopted four factors that help to determine whether the primary purpose of police interrogation is to enable police assistance to meet an ongoing emergency or instead to establish or prove past events. Davis, 547 U.S. at 827. First, was the speaker speaking about current events as they were actually occurring, requiring police assistance, or was he or she describing past events? Davis, 547 U.S. at 827. Second, would a "reasonable listener" conclude that the speaker was facing an ongoing emergency that required help? Davis, 547 U.S. at 827. Third, what was the nature of what was asked and answered? Do the questions and answers show, when viewed objectively, that the elicited statements were necessary to resolve the present emergency or do they show what happened in the past? Fourth, what was the level of formality of the interrogation? Davis, 547 U.S. at 827.

In State v. Koslowski, 166 Wn.2d 409, 209 P.3d 479 (2009), the Washington State Supreme Court applied the four factors set forth in Davis to statements made by a home robbery victim to police officers who responded to a house after the robbers had left. The court concluded that the robbery victim's statements to the police were testimonial. Id. at 421. First, the court said that although the time that had elapsed since the robbery was evidently short, the victim was describing past events that had already occurred. Id. at 422. "Nothing in her statements or the circumstances, as revealed by this record, indicates that the men who robbed her might return to the scene for any reason. The record shows that they had completed the robbery and left her residence and there is no evidence of any ongoing situation or relationship with [the victim]

that might suggest she was still in danger from them." Id. at 422. Second, the court said the victim was not facing an ongoing emergency because the robbers had left, she had freed herself from the hand ties that the robbers had put on her, and the police had arrived and were present to protect her. Id. at 424.

Third, regarding the nature of the interrogation, the court said the mere fact that the suspects were at large, and that one of the responding officers relayed the information he learned from the victim to officers in the field, is not enough to show that the questions asked and answered were necessary to resolve a present emergency situation. Id. at 426-27. "The interrogation here involved learning about the crimes that had occurred and obtaining information to apprehend the suspects, not to acquire information necessary to resolve any current emergency." Id. at 427. Last, regarding formality, the court noted that the police officers' questioning of the victim at her home was less formal than the taped interrogation at the police station in Crawford. Id. at 429.

Turning to the 911 calls from the store clerks at issue here, we similarly conclude they were testimonial. First, the store clerks were describing past events, although, the time that had elapsed since the robberies was short. The store clerks both reported that they had been robbed about two minutes before they called 911 and that the robber had already fled. In contrast, Davis held that statements were not testimonial when a 911 caller described events as they were actually happening: "He's here jumpin' on me again," and "He's usin' his fists." Davis, 547 U.S. at 817. As in Koslowski, there was nothing in the clerks' statements or the circumstances of the robberies to indicate that the robber might

6

return to the scene of the crime for any reason. 166 Wn.2d at 422. There was no evidence of any ongoing situation or relationship between the store clerks and the robber that might suggest that the clerks were still in danger. See id. at 422.

Second, a "reasonable listener" would not conclude that either store clerk was facing an ongoing emergency that required help. Both clerks reported that the robber had fled the store and neither reported being injured. Neither clerk expressed any reason to believe that the robber would return or that they faced any physical threat. By contrast, in State v. Ohlson, 162 Wn.2d 1, 168 P.3d 1273 (2007), the court held that statements made by a victim to police at the crime scene was a call for help against a bona fide physical threat where an assailant had previously left the scene only to return five minutes later with escalated behavior from yelling to physically assaulting the victims. Ohlson, 162 Wn.2d at 18; see also Davis, 547 U.S. at 827 (a 911 caller facing an ongoing emergency where the call was "plainly a call for help against bona fide physical threat"). Although police officers were not present at the crime scenes to protect the victims, as they were in Koslowski, there is no indication that either store clerk needed such protection here; therefore, the mere lack of police presence at the crime scenes when the 911 calls were made is not enough to turn this into an ongoing emergency.

Third, the questions asked and answered on the clerks' 911 calls contained the typical information one would expect on a 911 call, such as describing the emergency; location of caller; description of suspect, including clothing; whether the suspect was armed; where the suspect fled to and via what

means; and whether the caller was injured. Viewed objectively, these statements showed what happened in the past.

The State argues "the nature of the questions asked and answers given was for the purpose of locating the suspect in robberies that had just occurred" and that because a suspect was still at large, the gathering of information about the suspect was critical to ensuring the safety of responding officers. However, as the Koslowski court observed, "If merely obtaining information to assist officers in the field renders the statements nontestimonial, then virtually any hearsay statements made by crime victims in response to police questioning would be admissible—a result that does not comport with Crawford or Davis." Koslowski, 166 Wn.2d at 427. The 911 operators' questioning of the store clerks involved learning about the crimes that had occurred and obtaining information to apprehend the suspects. See id. at 427.

Fourth, the 911 calls were informal. There was no formal interrogation or in-person interview but instead short question-and-answer format phone conversations with a 911 operator while the store clerks were still at the stores that had been robbed.

In sum, considering all of the Davis factors, we conclude that the statements were testimonial. The circumstances objectively indicate that there was no ongoing emergency, and the primary purpose of the interrogation was to establish past events potentially relevant to later criminal prosecution. 547 U.S. at 827.

8

The State cites three Court of Appeals cases holding statements in 911 calls not testimonial in support of its argument that the store clerks' statements in the 911 calls were not testimonial. They are all readily distinguishable.

In State v. Williams, 136 Wn. App. 486, 150 P.3d 111 (2007), the court concluded that a 911 caller's overriding purpose was to secure police assistance to ensure her safety and the safety of her children after a group of men kicked down her apartment door and entered her apartment. Near the beginning of the 911 call she stated, "I am telling you some police officer better get here now," and "I can't have these men come shooting at my house." Id. at 502. Her demands for police assistance became more insistent stating, "[T]here's not a police officer here yet! . . . And these men are dangerous. They are gang members and they map all these corners here. My life is in fucking danger and my kids right now. And no police officer is pulling up! I'm scared!" Id. Then later, "I am sitting here scared for my fucking life and ain't nobody coming! Nobody!" Id. In contrast, the store clerks' 911 calls at issue here do not contain any claims that they are scared for their lives or that anyone is in danger.

In State v. McWilliams, 177 Wn. App. 139, 311 P.3d 584 (2013), the court concluded that a store clerk's call to 911 captured events as they occurred and that the caller faced an ongoing emergency. The caller reported that a person fired a shot, while he was on the phone, which shattered the store's window and hit another store clerk on the leg. Id. at 157. In State v. Reed, 168 Wn. App. 553, 567-68, 278 P.3d 203 (2012), the court determined that a 911 caller's boyfriend, who she reported had been beating her, choking her, and punching

her, posed a bona fide physical threat to her. In contrast, the 911 calls at issue here did not capture the robberies as they occurred but were reported after they were over, and the robber did not pose a physical threat to the store clerks at the time of the 911 calls. We do not find these cases the State relies upon persuasive.

The State argues that even if the 911 calls were admitted in error, the error was harmless.[1] We agree.

Confrontation clause violations are subject to harmless error analysis. State v. Watt, 160 Wn.2d 626, 635, 160 P.3d 640 (2007). Constitutional error is presumed to be prejudicial, and the State bears the burden of proving that the error was harmless. Id. A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error. Id.

In the instant case, the State presented surveillance videos from the Circle K and 7-Eleven, and still photographs taken from the videos, showing a person wearing a white jacket and sunglasses robbing the stores after displaying a gun from his right pocket. On the surveillance video of the Circle K robbery, the

---

[1] The State also claims in its brief that "[t]he [911] calls were an exception to the rule against hearsay and admissible as present sense impressions and excited utterances. ER 803(a)(1), (2)." However, the State fails to provide support for this claim with any argument. Because the State failed to make the argument, we decline to address it. See State v. Thomas, 150 Wn.2d 821, 868-869, 83 P.3d 970 (2004) (we "will not review issues for which inadequate argument has been briefed or only passing treatment has been made"). We note that the Washington State Supreme Court rejected a per se rule that excited utterances are not testimonial and recognized the possibility of a hybrid situation "where a predominantly excited utterance might contain testimonial elements." State v. Ohlson, 162 Wn.2d 1 at 17.

robber's voice is audible stating, "I need all the money," "You don't have JUUL?," and "Don't call the cops." The State presented evidence that American Spirit cigarettes, Marlboro cigarettes, and JUUL vaping products, which were sold at the robbed stores, were found in Tapaka's car after he was arrested. The State also presented the gun found at Tapaka's mother's house, where Tapaka also lived according to his girlfriend. The State presented evidence that Tapaka was arrested driving a car that matched the suspect vehicle description, including distinctive tire rims, in the area surrounding the robbed 7-Eleven just days after the robberies.

Florence Lyons, Tapaka's girlfriend at the time of the robberies, testified at trial that on the morning of the robberies, as she and Tapaka were driving around in his car, Tapaka talked about going into a store and robbing it. Lyons testified that Tapaka parked his car in Seattle, maybe West Seattle, then left the car with a gun in his right pocket. Lyons said Tapaka was wearing a white jacket and sunglasses. She said Tapaka was gone for about 20 minutes and then came back to the car with cigarettes, lighters, JUUL products, and money. She said Tapaka told her "I robbed the store." She testified that later they went to Tapaka's mother's house and that Tapaka went into the house. Lyons identified the gun recovered from Tapaka's mother's house as the gun he had the morning of the robberies, and she said she had seen him with the same gun before the

morning of the robberies as well. Lyons also identified herself and Tapaka in photographs taken from surveillance videos on the morning of the robberies.[2]

Tapaka points to the fact that in his post-arrest interview with detectives, in a redacted recording of which was played for the jury at trial, he denied any involvement in the robberies, but his explanation of how events unfolded is not persuasive. Tapaka admitted that he was in the car with Lyons on the morning of the robberies occurred but claimed, "We were smoking here, and a guy ran by with a gun. And he seen us, and he dropped the bag. And we picked it up, and that's when we took off." Later in the interview, he provided a seemingly inconsistent account stating, "[H]e took my fucking wallet with the gun, and he fucking told me to do everything that he said." "He told me to drive."

Given the overwhelming evidence against Tapaka, any reasonable jury would have reached the same result in the absence of the 911 calls. Any error in admitting the 911 calls was harmless.

### Ineffective Assistance of Counsel

Tapaka contends that his counsel was ineffective at trial because counsel allowed the jury to hear an allegedly prejudicial statement made by Detective Magan during his post-arrest interview of Tapaka. Tapaka claims his counsel failed to object to the statement or failed to adequately review the video before it

---

[2] Lyons identifies herself and Tapaka in photographs from Exhibit 18. The numbers of the photographs labeled within the Exhibit 18 designated on appeal do not correspond with the numbers of the photographs identified during Lyons' testimony. Nevertheless, it is clear from the record that including Lyons' testimony and the Exhibit 18 designated on appeal, that the photographs were from surveillance videos of the morning of the robbery.

was shown to the jury. The statement that Tapaka alleges is prejudicial occurred at the beginning of the interview recording shown to the jury. Detective Magan asks Tapaka, "Do you remember me? Do you remember the last time you were here?"

We review a claim of ineffective assistance of counsel de novo. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

Criminal defendants are guaranteed the right to effective assistance of counsel under our state and federal constitutions. U.S. CONST. amend. VI; CONST. art. I, § 22. To determine whether counsel was ineffective, we apply the two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficiency prejudiced him. Strickland, 466 U.S. at 687.

We need not "address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697. "In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697. A defendant is prejudiced when " 'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been

different.' " State v. Grier, 171 Wn.2d 17, 34, 246 P.3d 1260 (2011) (quoting State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)).

Tapaka fails to demonstrate prejudice because he has not demonstrated a reasonable probability that but for counsel's allegedly deficient performance, the outcome of the proceedings would have been different. The outcome of the proceedings would not have been different because the parties stipulated that Tapaka had previously been convicted of a serious offense, and the evidence against Tapaka was overwhelming.

To convict Tapaka of the unlawful possession of a firearm charge, the State had to prove that Tapaka had "previously been convicted of a serious offense." Tapaka chose to agree to a stipulation regarding this element of the offense rather than allowing the State to prove it by introducing evidence of his previous robbery conviction and resulting incarceration. Specifically, the parties agreed to stipulate that Tapaka had been convicted of a "serious offense" in King County Superior Court in 2015. The stipulation read,

> The parties have agreed that certain facts are true. You must accept as true that the person before the court who has been identified in the charging document as Defendant Seth C. Tapaka was convicted on October 26, 2015, of a serious offense in the State of Washington versus Seth C. Tapaka, King County Superior Court Cause Number 15-1-01653-5-SEA."

The trial court read this stipulation to the jury as part of the jury instructions. The trial court instructed the jury not to speculate as to the nature of the prior conviction and not to consider the stipulation for any other purpose other than the prior conviction element.

Because of this stipulation, the jury was aware that Tapaka had been convicted of a serious offense in King County Superior Court in 2015. Detective Magan's comment ("Do you remember me? Do you remember the last time you were here?") did not provide the jury additional information about Tapaka's previous criminal history beyond what the stipulation already established. Detective Magan's comment actually provided far less information than the stipulation because Detective Magan did not state that Tapaka had been convicted of any offense or that any conviction was for a serious offense. Detective Magan's comment did not inform the jury that Tapaka's previous conviction was for robbery. Significantly, another detective's comment during the interrogation, that Tapaka had a previous robbery conviction as a juvenile, was redacted from the recording played for the jury.

In addition, the evidence against Tapaka was overwhelming, as shown by the evidence detailed above in our harmless error analysis.

Because Tapaka stipulated that he had been previously convicted of a serious offense in King County Superior Court, and because the evidence against him was overwhelming, there is no reasonable probability that the outcome of Tapaka's case would have been different if Detective Magan's comment had been redacted. Because Tapaka makes an insufficient showing of prejudice, we need not address whether counsel's performance was deficient.

<u>See</u> <u>Strickland</u>, 466 U.S. at 697. Tapaka has not demonstrated prejudice and his claim of ineffective assistance of counsel thus fails.[3]

Community Custody Supervision Fees

Tapaka argues that the trial court erred by imposing the fees of community custody supervision on him because, among other reasons, the court failed to conduct an individualized inquiry regarding his ability to pay. The State concedes that community custody fees should be stricken from the judgment and sentence because the trial court failed to conduct an individualized inquiry into Tapaka's ability to pay. We accept the State's concession and remand to the trial court to strike the community custody supervision fees.

Statement of Additional Grounds

Tapaka has submitted a statement of additional grounds (SAG) identifying two additional grounds for review. First, Tapaka argues that he received ineffective assistance of counsel at trial because his counsel did not redact evidence of his prior robbery conviction from the recording of his interview that was shown to the jury. Tapaka's argument on this issue is substantively the same as his appellate counsel's argument, which we address above, and we defer to our analysis above.

---

[3] The State contends that Tapaka failed to establish a sufficient record on review to consider an ineffective assistance of counsel claim because the record does not show which redactions were requested by Tapaka's counsel and/or made by the prosecutor. Given our disposition on the prejudice prong, a record of the redactions requested by Tapaka's counsel was not necessary to decide the issue. We reject the State's argument that the record was insufficient to review this issue.

Second, Tapaka argues that the State failed to prove both robbery charges because it did not present sufficient evidence to identify Tapaka as the robber in either count.

Due process of law requires that the State prove every element of a charged crime beyond a reasonable doubt in order to obtain a criminal conviction. State v. O'Hara, 167 Wn.2d 91, 105, 217 P.3d 756 (2009). Sufficiency of the evidence is a question of constitutional law that we review de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

Evidence is sufficient to support a conviction if, viewed in the light most favorable to the State, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn from that evidence. Id. Circumstantial and direct evidence are equally reliable. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

As detailed in our harmless error analysis above, the evidence against Tapaka was overwhelming. Regarding the issue of identity specifically, the jury could compare the robber shown in the 7-Eleven and Circle K surveillance videos, still photographs taken from those videos, the photograph of Tapaka, and the video of Tapaka's interview by detectives, or Tapaka sitting in the defendant's chair at trial, and infer the robber was Tapaka. The jury could compare the robber's voice heard on the Circle K surveillance video to Tapaka's voice in his video recorded interview and infer the voice was the same. The jury could

17

compare the gun recovered from Tapaka's mother's house to the gun used in the robberies and infer it was the same gun. The jury could infer that the American Spirit and Marlboro cigarettes and JUUL products found in Tapaka's car after he was arrested, were the items taken from the convenience stores, which both sold those items. The jury could credit evidence that Tapaka was pulled over driving a car that matched the suspect vehicle description, including the distinctive tire rims, in the vicinity of the 7-Eleven that was robbed.

The jury could credit Lyons' testimony that Tapaka talked about robbing a store, left the car with a gun wearing a white jacket and sunglasses (just like the robber in the surveillance videos of both robberies), then came back with money, cigarettes, and JUUL lighters and said, "I robbed the store." Lyons testified that she remembered Tapaka leaving the car once and could not recall if he left the car again. However, she admitted to that morning being high on Xanax and cocaine, and she and Tapaka had also smoked marijuana, so it was possible he left the car again and she did not remember. From Lyons' testimony, the jury could infer that Tapaka committed the robberies on the morning in question.

Viewed in the light most favorable to the State, there was sufficient evidence for the jury to identify Tapaka as the robber in both robbery charges beyond a reasonable doubt.

Tapaka's statement of additional grounds for review fails to establish grounds for appellate relief.

## CONCLUSION

We affirm Tapaka's convictions for robbery in the first degree and unlawful possession of a firearm in the first degree, and remand to the trial court to strike the community custody supervision fees.

_Coburn, J._

WE CONCUR:

_Andrus, A.C.J._