# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57863-8-II |
| Respondent, | |
| v. | |
| NATHAN ALEXANDER FREEMAN, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Nathan A. Freeman appeals his felony conviction for violating a no-contact order.  Freeman argues that the trial court violated his right to confront the witnesses against him by admitting into evidence a recorded 911 call that included statements made by witnesses who did not testify at trial.  Because the primary purpose of the statements in the 911 call was to allow police to respond to an ongoing emergency, we hold that the admission of the statements did not violate Freeman's confrontation clause rights.  Furthermore, the statements in the 911 call were admissible under the excited utterance and present sense impression hearsay exceptions.

Freeman also argues that the trial court erred by giving a to-convict jury instruction that contained different standards for conviction and acquittal.  We hold that the challenged instruction did not provide different standards.  Moreover, Freeman invited any alleged error.  Therefore, the trial court did not err.

No. 57863-8-II

We affirm Freeman's conviction. However, we remand to the trial court with instructions to correct the scrivener's error in Freeman's judgment and sentence by striking the community custody condition prohibiting Freeman from contacting S.C.

FACTS

On June 19, 2020, the King County Superior Court issued a no-contact order prohibiting Freeman from contacting or coming within 1,000 feet of S.C. The order expired on June 19, 2022.

A.    ALLEGED NO-CONTACT ORDER VIOLATION AND 911 CALL

On January 2, 2022, S.C.'s daughter, N.C.-C., called 911 for help. In a recording of the 911 call, S.C.[1] and a man can be heard arguing in the background.

During the first part of the 911 call, N.C.-C. asked for help five times. In response to the 911 operator's questions, N.C.-C. relayed the address of the apartment from where she was calling, indicated that no one was injured, and stated that she had not seen a gun or knife. The 911 operator also asked if anyone had been drinking or doing drugs, and N.C.-C. stated that the man was high on crack.[2]

At that point, the 911 operator asked N.C.-C. to identify the man and N.C.-C. responded, "He – he – he left. He left so. . . ." Clerk's Papers (CP) at 37. The 911 operator then asked for the man's name, and N.C.-C. identified the man as "Nate Freeman." CP at 37. The 911 operator also asked what was Freeman's relationship to S.C., and N.C.-C. responded, "This is her boyfriend, or whatever he—I don't know." CP at 37. The 911 operator then asked N.C.-C. for information

---

[1] The parties do not dispute that the other female voice that can be heard on the 911 call was S.C.

[2] The trial court excluded this statement and that ruling is not challenged on appeal.

"in case he comes back," including Freeman's physical appearance. CP at 38. N.C.-C. stated that Freeman had left "on foot." CP at 40.

After N.C.-C. told the 911 operator that Freeman had left, S.C. and N.C.-C. both stated that Freeman lived at the apartment. S.C. also said, "We got a restraining order," and N.C.-C. agreed with S.C.'s statement. CP at 40. The 911 operator proceeded to ask for Freeman's date of birth, S.C.'s name and date of birth, and confirmed that no one needed medical attention. The 911 operator also asked whether N.C.-C. knew in what direction Freeman left, and N.C.-C. said she was "not sure." CP at 42. S.C. then told the 911 operator that Freeman would "go under the bridge." CP at 42. N.C.-C. also told the 911 operator that Freeman would hide under a bridge or freeway overpass and that would be the place to check for him. The 911 operator ended the call by advising N.C.-C. that "if anything changes before we get back to you there . . . if he returns, just call us and let us know, so we can reroute the units to the apartment rather than looking for him over there." CP at 44.

On May 20, 2022, the State filed an amended information charging Freeman with several crimes, including one count of domestic violence felony court order violation—domestic violence. The State later filed a second amended information charging Freeman only with one count of domestic violence felony court order violation and one count of residential burglary.[3]

---

[3] After the State rested its case in chief, Freeman moved to dismiss the residential burglary charge, arguing the State did not produce any "evidence that [Freeman] unlawfully entered any dwelling." 4 Verbatim Rep. of Proc. (VRP) (Dec. 21, 2022) at 283. The trial court dismissed the charge for insufficient evidence.

B.     PRETRIAL MOTIONS

Freeman moved to suppress the 911 recording, arguing that admitting portions of it would violate his confrontation clause rights.  After a hearing on the motion to suppress, the trial court ruled that N.C.-C.'s statements were "clearly nontestimonial" and that the confrontation clause did not bar their admission.[4]  2 Verbatim Rep. of Proc. (VRP) (Dec. 19, 2022) at 69.  The trial court also ruled that N.C.-C. and S.C.'s hearsay statements were admissible under the excited utterance and present sense impression exceptions to the hearsay rule.  The trial court noted that the recording depicted "an ongoing situation which is quite chaotic, and [N.C.-C.'s] calling and asking for help.  She's not really saying . . . what necessarily is going on, but she's asking for help.  And I think that that is both a present-sense impression and an excited utterance."  2 VRP (Dec. 19, 2022) at 70-71.

In addition to the motion to suppress the 911 recording, Freeman sought to bifurcate the trial and proposed bifurcated jury instructions.  Freeman argued that the jury should first be instructed on the no-contact order violation, determine whether Freeman violated the order, and *then* be instructed on and determine whether he had two previous convictions for a no-contact order violation.  This would, according to Freeman, protect him "from juries drawing unfair, unreasonable, unlawful conclusions based upon [his] prior conviction."  3 VRP (Dec. 20, 2022) at

---

[4] Although the trial court found the majority of the statements in the 911 recording were not testimonial and admissible, the trial court did exclude a few of N.C.-C. and S.C.'s statements made in the 911 recording.  First, the trial court excluded N.C.-C. and S.C.'s statements that Freeman stole S.C.'s phone because they were testimonial.  Second, the trial court excluded N.C.-C. and the operator's statements that Freeman was on drugs because "there's no indication or any basis of knowledge for that."  2 VRP (Dec. 19, 2022) at 71.  Finally, the trial court excluded N.C.-C.'s statement that the 911 operator had "probably heard of [Freeman]."  2 VRP (Dec. 19, 2022) at 71.  The trial court's exclusion of these statements is not challenged on appeal.

147. The trial court declined bifurcating the trial but stated it would consider Freeman's proposed jury instructions.

C.     TRIAL

The case proceeded to a jury trial. Neither N.C.-C. nor S.C. testified at trial.

The State called as its first witness Officer David A. Temple, Jr., one of the officers who responded to the scene on January 2nd. Officer Temple testified that dispatch advised him of a no-contact order violation. When Officer Temple arrived on the scene, he found S.C. and N.C.-C. Officer Temple testified that there were two other children in the apartment. Officer Temple did not find Freeman in the apartment or the surrounding area. Officer Temple identified S.C. as the protected party and Freeman as the restrained party in the no-contact order. On cross-examination, Officer Temple acknowledged that he had no personal knowledge of whether Freeman was present in the apartment on January 2nd.

The State's next witness was Bridget Adams, a disclosure analyst for South Sound 911. As a disclosure analyst, Adams "provide[s] 911 audio and CAD logs to requestors." 3 VRP (Dec. 20, 2022) at 207. During Adams' testimony, the State offered, and the trial court admitted, a redacted recording of the 911 call into evidence. The redacted 911 call admitted into evidence complied with the trial court's pretrial ruling on Freeman's motion to suppress.

The State then called Sergeant Kevin Karuzas, another officer who responded to the 911 call, as its final witness. Like Officer Temple, Sergeant Karuzas testified that he responded to a no-contact order violation. Freeman was not on the scene when he arrived. The State played the redacted 911 recording for the jury during Sergeant Karuzas's testimony. On cross-examination,

Sergeant Karuzas acknowledged that he had no personal knowledge of whether Freeman was present in the apartment on January 2nd.

No other witnesses testified at the trial.

D.      JURY INSTRUCTIONS

The trial court's to-convict instruction for the no-contact order violation charge included an element that Freeman had two previous convictions for violating a no-contact order.  Freeman objected to the trial court's to-convict instruction.  Specifically, Freeman argued that the trial court should "bifurcate the trial or the jury's deliberations" such that "they [would] have to [decide] . . . whether or not [Freeman] actually violated a no-contact order" before addressing "whether or not he had two prior[] [no contact order violation convictions]."  4 VRP (Dec. 21, 2022) at 302.  Freeman expressed concern that unless the jury's deliberations were bifurcated, "the jury will basically look at the fact that he has committed two priors and reach the conclusion that he has a propensity to violate the no-contact order."  4 VRP (Dec. 21, 2022) at 302.

The trial court rejected Freeman's argument.  However, to ameliorate any potential prejudice to Freeman, the trial court accepted a stipulation that Freeman had two previous convictions for violating a no-contact order and included language warning the jury it could consider the previous convictions only as "evidence . . . of the prior convictions elements" and for no "other purpose."  Ex. 13, at 1.

The to-convict instruction ultimately given to the jury included the following language:

> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

6

On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP at 81. Freeman did not object to this language, and his proposed to-convict instruction included the same language.

The jury found Freeman guilty of violating the no contact order, and that Freeman and S.C. were intimate partners.[5]

E.    SENTENCING

Freeman was sentenced to an exceptional downward sentence of 48 months in custody with 12 months community custody. At sentencing, the State asked whether "the Court wish[ed] to impose another no-contact order? I'm sure [S.C.] does not want another no-contact order." 7 VRP (Feb. 3, 2023) at 398. The trial court responded that it would not "impose another [no-contact order] based on this conviction." 7 VRP (Feb. 3, 2023) at 398. The trial court also crossed out the no-contact provision from Freeman's judgment and sentence. However, Freeman's judgment and sentence included a community custody condition prohibiting Freeman from contacting S.C.

Freeman appeals.

ANALYSIS

A.    THE CONFRONTATION CLAUSE

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. "The Fourteenth Amendment renders the [Confrontation] Clause binding on the States." *Michigan v. Bryant*, 562 U.S. 344, 352, 131 S. Ct.

---

[5] The verdict forms were not included in the record on appeal.

1143, 179 L. Ed. 2d 93 (2011). The confrontation clause bars admission of an absent witness's testimonial statements at trial unless "the declarant is unavailable" and "the defendant has had a prior opportunity to cross-examine" the declarant. *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); *see also State v. Burke*, 196 Wn.2d 712, 725, 478 P.3d 1096 ("The confrontation clause prohibits the admission of testimonial statements unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination."), *cert. denied*, 142 S. Ct. 182 (2021). "Nontestimonial hearsay . . . is admissible under the Sixth Amendment subject only to the rules of evidence." *State v. Pugh*, 167 Wn.2d 825, 831-32, 225 P.3d 892 (2009).

We review confrontation clause challenges de novo. *Burke*, 196 Wn.2d at 725. "For purposes of determining whether the statements were admissible, the facts are limited to those presented at the admissibility hearing."[6] *Id.* at 729 n.8.

---

[6] At the pretrial suppression hearing, both parties provided a full, unredacted transcript of the 911 recording. The trial court excluded several statements from the 911 recording: N.C.-C. and S.C.'s statements that Freeman had stolen S.C.'s phone, N.C.-C.'s statement that the 911 operator had likely heard of Freeman before, and N.C.-C. and the 911 operator's comments that Freeman was high on drugs. Because we determine admissibility using "the facts . . . presented at the admissibility hearing," we consider the unredacted transcripts in addition to the redacted recording in making our decision. *Burke*, 196 Wn.2d at 729 n.8. In doing so, however, we note that the State's and Freeman's transcripts differ slightly. For example, what the State transcribed as "hit me," Freeman transcribed as "kicked me." *Compare* CP at 31 *with* CP at 56. But, it appears that the trial court provided the jury with a redacted version of the State's transcript to use as an aid while listening to the recording. Thus, we consider the State's unredacted transcript in assessing the confrontation clause issue.

Freeman also attached transcripts of two additional 911 calls made by Linda Wilson to his suppression motion. It is unclear who Wilson is or how she is related to this case, and neither Freeman nor the State appears to have referenced these transcripts in their motions or arguments before the trial court. Thus, we do not consider these transcripts.

Washington courts apply the primary purpose test to determine whether out-of-court statements are testimonial or nontestimonial. *Id.* at 725-26 A statement is testimonial "'when the circumstances objectively indicate that . . . the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'" *Id.* at 726 (alteration in original) (quoting *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006)); *see also State v. Hart*, 195 Wn. App. 449, 459, 381 P.3d 142 (2016) ("Generally, a statement is testimonial if made to establish or prove some fact or if a reasonable person in the declarant's position would anticipate that his or her statement would be used against the accused in investigating or prosecuting a crime."), *review denied*, 187 Wn.2d 1011 (2017), *abrogated on other grounds by State v. Burns*, 193 Wn.2d 190, 210-11, 438 P.3d 1183 (2019). "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency."[7] *Davis*, 547 U.S. at 822.

---

[7] In *Davis*, the Court acknowledged that "[i]f 911 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they conduct interrogations of 911 callers." 547 U.S. at 823 n.2. The Court assumed without deciding that statements made to a 911 operator could be testimonial. *Id.* Our supreme court did the same in *Burke*, noting that "a person conducting an interrogation *for* the police may be considered an agent of the police for purposes of the confrontation clause," citing the *Davis* Court in support. 196 Wn.2d at 728. The *Burke* court then went on to analyze whether statements made to a sexual assault nurse examiner were testimonial or not. *Id.* at 729-38. Washington courts have also analyzed statements made to a 911 operator under the confrontation clause in other cases. *See, e.g.*, *Pugh*, 167 Wn.2d at 831-34 (analyzing whether statements made to a 911 operator were testimonial); *State v. Robinson*, 189 Wn. App. 877, 892, 359 P.3d 874 (2015) (concluding "that the statements in the 911 call were not testimonial"); *State v. Reed*, 168 Wn. App. 553, 562-71, 278 P.3d 203 (analyzing whether statements made to 911 operators over two calls were testimonial), *review denied*, 176 Wn.2d 1009 (2012). Thus, we determine the testimonial nature of N.C.-C.'s statements under the confrontation clause regardless of the fact that they were made to a 911 operator rather than a police officer.

In applying the primary purpose test, we "'objectively evaluat[e] the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs.'" *Burke*, 196 Wn.2d at 726 (quoting *Bryant*, 562 U.S. at 370). Determining "whether an emergency exists and is ongoing is a highly context-dependent inquiry." *Bryant*, 562 U.S. at 363.

Washington courts look at four factors to determine the primary purpose of a challenged statement. *State v. Koslowski*, 166 Wn.2d 409, 418-19, 421, 209 P.3d 479 (2009).

First, the court asks, "Was the speaker speaking about current events as they were actually occurring, requiring police assistance, or was he or she describing past events? The amount of time that has elapsed (if any) is relevant." *Id.* at 418. Describing "events as they [are] actually happening" suggests the statements are nontestimonial. *Id.* at 422; *see also State v. Ohlson*, 162 Wn.2d 1, 12, 168 P.3d 1273 (2007).

Second, the court asks, "Would a 'reasonable listener' conclude that the speaker was facing an ongoing emergency that required help? A plain call for help against a bona fide physical threat is a clear example where a reasonable listener would recognize that the speaker was facing such an emergency." *Koslowski*, 166 Wn.2d at 419. Where the record lacks "any evidence from which to conclude that there was an ongoing emergency requiring help, such as a bona fide physical threat," this factor weighs in favor of finding the statements are testimonial. *Id.* at 425.

Third, the court asks,

> What was the nature of what was asked and answered? Do the questions and answers show, when viewed objectively, that the elicited statements were necessary to resolve the present emergency or do they show, instead, what had happened in the past? For example, a 911 operator's effort to establish the identity of an assailant's name so that officers might know whether they would be encountering a violent felon would indicate the elicited statements were nontestimonial.

*Id.* at 419.

Fourth, the court asks, "What was the level of formality of the interrogation? The greater the formality, the more likely the statement was testimonial. For example, was the caller frantic and in an environment that was not tranquil or safe?" *Id.*

"[A] conversation which begins as an interrogation to determine the need for emergency assistance" can become testimonial "once that purpose has been achieved." *Davis*, 547 U.S. at 828; *see also State v. Reed*, 168 Wn. App. 553, 565, 278 P.3d 203 ("[T]he trial court was permitted to determine that, although the latter portion of [the victim's] second 911 call was testimonial, the statements in the first portion of the call did not implicate [the defendant's] right to confrontation."), *review denied*, 176 Wn.2d 1009 (2012).

B.      STATEMENTS MADE AFTER FREEMAN LEFT THE APARTMENT WERE NONTESTIMONIAL

Here, Freeman argues that N.C.-C. and S.C.'s statements made in the 911 call after N.C.-C. said "he left" are testimonial, and because neither N.C.-C. nor S.C. testified at trial, the admission of those statements at trial violated his rights under the confrontation clause. Freeman appears to concede that the statements preceding Freeman's leaving the apartment are nontestimonial. *See* Br. of Appellant at 18 ("The call included testimonial hearsay that should have been excluded. After the caller's initial statements, any emergency dissipated. The turning point came when the man left."). Thus, we focus on whether the statements made after N.C.-C. told that 911 operator that "he left" are testimonial.

With regard to the first factor—whether the challenged statements described current or past events—after stating "he left," N.C.-C. named and described Freeman to the 911 operator, described Freeman's relationship to S.C., stated that Freeman lived at the location from where

N.C.-C. called 911, identified herself and S.C. by name, alerted the 911 operator that S.C. had a no-contact order against Freeman, and speculated as to where Freeman might have fled. S.C. also described Freeman, confirmed the existence of a no-contact order, provided Freeman's date of birth, and speculated as to where Freeman might have fled. N.C.-C. and S.C.'s descriptions of Freeman and his relationship to them, provided information about the event that precipitated the 911 call (i.e., the no-contact order violation), and described the situation to the 911 operator. The statements were made immediately after Freeman's departure and may be considered to have been "made contemporaneously with the events described." *Ohlson*, 162 Wn.2d at 17; *see also Reed*, 168 Wn. App. at 566 ("As our Supreme Court has observed, where statements are made 'within minutes of the assault,' such events may properly be considered as 'contemporaneous[] with the events described.'" (alteration in original) (quoting *Ohlson*, 162 Wn.2d at 17)). Thus, the first factor weighs in favor of finding N.C.-C. and S.C.'s statements were nontestimonial.

Regarding the second factor—the existence of an ongoing emergency—a reasonable listener would conclude that despite Freeman's departure, N.C.-C. and S.C. were still facing an ongoing emergency because an assailant's departure from the scene does not automatically terminate an emergency if the circumstances indicate he might return. While N.C.-C. and S.C. speculated that Freeman would go hide elsewhere, N.C.-C. also told the 911 operator she was not sure what direction Freeman went after he left. Furthermore, N.C.-C. and S.C. both told the 911 operator Freeman lived in the apartment that they were calling from, a strong indication Freeman could return. Furthermore, because Freeman lived in the apartment, Freeman presumably had a way to enter his own dwelling; therefore, Freeman's contention that N.C.-C. and S.C. could have locked the door after he left and thus mitigated any ongoing emergency is unpersuasive.

In *Reed*, Division One concluded that the defendant's departure from the scene of an assault did not end an ongoing emergency. 168 Wn. App. at 567-68. Reed argued that the admission of two recorded 911 calls made by the victim violated the confrontation clause. *Id.* at 562. After initially calling 911 to report she was being assaulted by Reed, the victim called 911 again several hours later, reporting that Reed had just beat her again. *Id.* at 559-60. The victim said Reed "had left her by the side of the road in an unfamiliar area," she "struggled to convey her location to the operator," and "told the operator that she needed a 'cop' but did not require medical assistance." *Id.* at 560. In applying the second factor, Division One concluded that Reed's departure from the scene did not vitiate the emergency: "[The victim] was alone and injured," and "[t]he operator was aware that Reed, having driven away only moments before [the victim] placed the call, was highly mobile and could potentially return to the scene to resume the assault." *Id.* at 568.

Similarly, here, N.C.-C. and S.C. were alone in the apartment with two other children. At the beginning of the 911 recording, S.C. and Freeman could be heard engaging in a heated argument that involved physical contact. While Freeman had left the apartment, he could easily return and pose a risk of physical harm. Because a reasonable listener would conclude that N.C.-C. and S.C. faced an ongoing emergency despite Freeman's departure, the second factor weighs in favor of finding their statements were nontestimonial.

With regard to the third factor—the nature of what was asked and answered—most of the 911 operator's questions following Freeman's departure elicited information that was necessary to allow officers to "know whether they would be encountering a violent felon." *Koslowski*, 166 Wn.2d at 419. For example, N.C.-C.'s responses identifying and describing Freeman provided information that allowed officers to "know whether they would be encountering a violent felon."

*Id.* In the context of "domestic disputes[,] . . . '[o]fficers called to investigate . . . need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim.'" *Davis*, 547 U.S. at 832 (some alterations in original) (quoting *Hiibel v. Sixth Judicial Dist. of Nevada, Humboldt County*, 542 U.S. 177, 186, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (2004)). The statements in response to the 911 operator's inquiry about whether N.C.-C. and S.C. needed medical attention provided similarly necessary information. *See Reed*, 168 Wn. App. at 566-67 ("[T]he nature of the questions asked indicates that the purpose of the interrogation was to resolve an emergency. The [911] operator's questions . . . were designed to ascertain [the victim's] . . . need for medical assistance," among other things); *see also Bryant*, 562 U.S. at 365 ("The victim's medical state also provides important context for first responders to judge the existence and magnitude of a continuing threat to the victim, themselves, and the public."). And N.C.-C. and S.C.'s speculation about Freeman's location helped responding officers "determine whether [Freeman] remained in the area where he could continue to pose a threat to [the victim] and responding officers." *Reed*, 168 Wn. App. at 567. Because the exchange with the 911 operator after Freeman left provided information officers needed to assess and resolve the ongoing emergency, the third factor weighs in favor of finding N.C.-C. and S.C.'s statements were nontestimonial.

Regarding the fourth factor—the formality of the exchange—the 911 operator's post-departure questions occurred in an atmosphere that was significantly calmer than it had been prior to Freeman's departure. Also, the 911 operator's questions to N.C.-C. advanced from asking about Freeman's identity to seeking a description of his physical attributes and information about the no-contact order. *See Davis*, 547 U.S. at 828-29 (because the operator's questions were like the

questions posed by the "structured police questioning" in *Crawford*, the victim's statements in response were testimonial (quoting *Crawford*, 541 U.S. at 53 n.4)). Thus, the fourth factor weighs in favor of finding N.C.-C. and S.C.'s statements were testimonial.

Overall, three of the four factors weigh in favor of finding that the primary purpose of the statements made following Freeman's departure was to allow police to respond to an ongoing emergency, meaning N.C.-C. and S.C.'s statements were nontestimonial. Because there was reason to believe that Freeman might return to the apartment, his initial departure did not end the emergency posed by his being in S.C.'s presence despite the no-contact order. Furthermore, N.C.-C. and S.C.'s statements regarding Freeman's identity, description, relationship to S.C., and location were necessary to allow officers to assess and resolve the ongoing emergency. Thus, the trial court did not violate the confrontation clause when it admitted the statements made in the 911 call after Freeman left the apartment.

C.    EVIDENTIARY ANALYSIS

Freeman argues that even if admitting the 911 call did not violate the confrontation clause, the trial court abused its discretion by admitting the call under the excited utterance and present sense impression exceptions to the hearsay rule. We disagree.

Evidentiary rulings are reviewed for an abuse of discretion. *Burke*, 196 Wn.2d at 740. A trial court abuses its discretion when its decision is manifestly unreasonable or is based on untenable grounds or reasons. *State v. Numrich*, 197 Wn.2d 1, 27, 480 P.3d 376 (2021). A trial court does not abuse its discretion unless it can be said "'that no reasonable judge would have made the same ruling.'" *Burke*, 196 Wn.2d at 741 (quoting *Ohlson*, 162 Wn.2d at 8).

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay statements are inadmissible at trial unless one of the exceptions to the hearsay rule applies, such as the excited utterance or present sense impression exceptions. ER 802.

1.      Excited Utterance

An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." ER 803(a)(2). The party seeking admittance of a statement as an excited utterance must meet three requirements: "(1) a startling event or condition occurred, (2) the declarant made the statement while under the stress of excitement of the startling event or condition, and (3) the statement related to the startling event or condition." *Ohlson*, 162 Wn.2d at 8. "Often, the key determination is whether the statement was made while the declarant was still under the influence of the event to the extent that the statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment." *State v. Woods*, 143 Wn.2d 561, 597, 23 P.3d 1046 (2001), *cert. denied*, 534 U.S. 964 (2001), *overruled on other grounds by State v. Schierman*, 192 Wn.2d 577, 739 n. 69, 438 P.3d 1063 (2018).

The first two requirements "must . . . be established by evidence extrinsic to the declarant's bare words." *State v. Young*, 160 Wn.2d 799, 810, 161 P.3d 967 (2007). Said evidence "can include circumstantial evidence, such as the declarant's behavior, appearance, and condition; appraisals of the declarant by others; and the circumstances under which the statement is made." *Id.*

16

Here, the argument between S.C. and Freeman, which can be heard in the background of the 911 call, was a startling event. The trial court found that there was "an ongoing situation which is quite chaotic, and [N.C.-C.]'s calling and asking for help." 2 VRP (Dec. 19, 2022) at 70-71. The 911 recording supported this finding: N.C.-C. asked for help multiple times during the 911 call; N.C.-C. had trouble answering the 911 operator's questions, with the background fight often interrupting N.C.-C. and forcing her to begin her answers again; and N.C.-C. made her statements on a 911 call, a context tending to indicate the existence of a startling event or condition. Thus, there was sufficient circumstantial evidence that a startling event or condition occurred, satisfying the first requirement.

Also, the 911 recording shows that N.C.-C.'s statements were made while she was under the stress of the excitement caused by S.C. and Freeman's argument. N.C.-C.'s voice is distressed in the call and she has trouble speaking over the argument in the background. As the trial court stated, "Comments have been made about [N.C.-C.] being calm on the call. I don't think that that factors into the way she's actually presenting on the phone. We've got an ongoing situation which is quite chaotic, and she's calling and asking for help." 2 VRP (Dec. 19, 2022) at 70-71.

Freeman argues that "[w]hen statements are made in response to questioning, 'this tends to counter the element of spontaneity' that justifies admission of an excited utterance." Br. of Appellant at 21 (quoting *State v. Ramires*, 109 Wn. App. 749, 758, 37 P.3d 343, *review denied*, 146 Wn.2d 1022 (2002)). While it is true that "[a] declarant's ability to provide detailed information about the event . . . tends to show a calm, reflective state of mind," N.C.-C.'s state of mind was anything but calm or reflective before Freeman left: the 911 operator had to ask N.C.-C. where she was three times before she answered, and when she did, she was interrupted repeatedly

17

before she provided a full address. *Ramires*, 109 Wn. App. at 758. And, "[t]he fact that a statement is made in response to a question will not by itself require the statement be excluded." *State v. Chapin*, 118 Wn.2d 681, 690, 826 P.2d 194 (1992). Here, there was sufficient evidence that N.C.-C. was under the stress of a startling event when she made her statements before Freeman left, satisfying the second requirement.

Finally, N.C.-C.'s statements clearly related to S.C. and Freeman's argument: she repeatedly called for help, provided her location, and stated that she had not seen any weapons and that nobody around her was injured. These statements were all spurred by, and directly related to, the argument heard going in the background of the 911 call. Thus, the third requirement of the excited utterance exception is satisfied. Because the trial court's decision to admit the first portion of the 911 call under the excited utterance exception was not based on untenable grounds or reasons, and was not a decision that no reasonable judge would make, the trial court did not abuse its discretion.

The same is true about the statements S.C. made before Freeman left: her voice is raised in argument with Freeman and her statements suggest she was involved in some sort of altercation, all indicating a startling event. Like N.C.-C., S.C.'s tone demonstrates her statements were made while she felt the stress of the argument. Finally, S.C.'s statements were in direct response to the altercation she was embroiled in, so they related to the startling event. Thus, the trial court did not err in admitting the redacted 911 recording that included S.C.'s excited utterances.

2.      Present Sense Impression

As for the statements made after Freeman left the apartment, the trial court did not err in admitting those statements because they were present sense impressions. A present sense

impression is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." ER 803(a)(1). "Present sense impression statements must grow out of the event reported and in some way characterize that event." *State v. Martinez*, 105 Wn. App. 775, 783, 20 P.3d 1062 (2001), *overruled on other grounds by State v. Rangel-Reyes*, 119 Wn. App. 494, 499-500 n.1, 81 P.3d 157 (2003). "The statement must be a 'spontaneous or instinctive utterance of thought,' evoked by the occurrence itself, unembellished by premeditation, reflection, or design. It is not a statement of memory or belief." *Id.* (quoting *Beck v. Dye*, 200 Wash. 1, 9, 92 P.2d 1113 (1939)). A statement made in response to a question can be a present sense impression. *See State v. Robinson*, 189 Wn. App. 877, 889-90, 359 P.3d 874 (2015) (911 call where speaker responded to dispatcher's questions deemed a present sense impression).

Here, N.C.-C.'s statements made after Freeman left the apartment were a continuation of the situation that precipitated the 911 call. N.C.-C. called 911 to ask for help as S.C. and Freeman engaged in a heated argument. As the trial court observed, "[S]he's asking for help." 2 VRP (Dec. 19, 2022) at 71. In response to N.C.-C.'s pleas for help, the 911 operator tried to assess the situation, asked questions about who and what was involved, and N.C.-C. responded in turn, providing the necessary information to describe what was going on (i.e., describing who she and her mother were, and who and where Freeman might have been) and whether anyone was hurt. S.C. provided similarly necessary information by confirming Freeman lived at the apartment, stating there was a restraining order, providing Freeman's date of birth, describing Freeman's clothing, and describing where Freeman might be.

Overall, N.C.-C. and S.C.'s statements helped "characterize th[e] event" by establishing that it was a potential no-contact order violation and identifying the protected and restrained parties. *Martinez*, 105 Wn. App. at 783. Given the circumstances, there was no time for N.C.-C. or S.C. to embellish, reflect on, or design their responses to the 911 operator; the statements were made immediately after Freeman left the apartment. Thus, the trial court did not abuse its discretion in admitting N.C.-C. and S.C.'s statements as present sense impressions.

D.     JURY INSTRUCTION ERROR

Freeman assigns error to the trial court's to-convict jury instruction. Specifically, he argues that because the instruction told jurors they could convict Freeman if they "*find from the evidence that each of these elements has been proved beyond a reasonable doubt*," but could acquit only "after *weighing all the evidence*," the instruction suggested a "less onerous [standard]" for conviction than for acquittal. CP at 81; Br. of Appellant at 25 (emphasis added). We disagree.

We review alleged jury instruction errors de novo. *State v. Weaver*, 198 Wn.2d 459, 464, 496 P.3d 1183 (2021). "'To satisfy the constitutional demands of a fair trial, the jury instructions, when read as a whole, must correctly tell the jury of the applicable law, not be misleading, and permit the defendant to present his theory of the case.'" *Id.* at 465-66 (quoting *State v. O'Hara*, 167 Wn.2d 91, 105, 217 P.3d 756 (2009)). "Jurors are presumed to follow the court's instruction." *Id.* at 467.

Here, the challenged instruction does not create varying standards for conviction and acquittal. Both clauses that Freeman challenges as differentiating how jurors are to examine the evidence use the phrase "the evidence." CP at 81. The challenged instruction does not say "some of the evidence" or delineate what evidence need be considered under either clause. Ultimately,

20

the instruction directs the jury to convict or acquit only after considering the evidence and to base its verdict on the evidence.

Other instructions reiterate as much, and we presume jurors follow instructions. *Weaver*, 198 Wn.2d at 467. For example, the jury was instructed that it is their "duty to decide the facts in this case based upon the evidence presented . . . during this trial" and the jury was cautioned that the jury's "decision[] . . . must be made solely upon the evidence presented during these proceedings." CP at 73. The jury was also instructed that they "must consider *all* of the evidence . . . admitted that relates to the proposition" and that "[e]ach party is entitled to the benefit of *all* of the evidence." CP at 73, 74 (emphasis added). Thus, when considered in the context of all the jury instructions, the trial court did not err in giving the challenged to-convict instruction.

Even if we were to assume there was error, any alleged error was invited. The invited error doctrine precludes this court from reviewing errors in jury instruction, "'even where constitutional rights are involved . . . when the defendant has proposed an instruction or agreed to its wording.'" *Weaver*, 198 Wn.2d at 465 (quoting *State v. Winings*, 126 Wn. App. 75, 89, 107 P.3d 141 (2005)); *see also State v. Summers*, 107 Wn. App. 373, 381, 28 P.3d 780 (2001) ("When a defendant proposes an instruction that is identical to the instruction the trial court gives, the invited error doctrine bars an appellate court from reversing the conviction because of an error in that jury instruction."). Here, Freeman's proposed to-convict instruction contained language identical to the language he now challenges on appeal.

In his reply brief, Freeman argues that the invited error doctrine does not apply because by agreeing to the stipulation regarding his prior no-contact order violation convictions, "he implicitly withdrew [his] proposed instruction." Reply Br. of Appellant at 16. But regardless of whether a

jury instruction can be "implicitly withdrawn" or not, the language Freeman now challenges on appeal is identical to the language he proposed. Freeman also fails to cite any authority suggesting that jury instructions can be implicitly withdrawn, and that if they are, the invited error doctrine no longer applies. *See DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.").

The trial court did not err in its to-convict jury instruction. Even assuming there was error, the invited error doctrine precludes review of the alleged error. Freeman's challenge fails.

E.      COMMUNITY CUSTODY CONDITION PROHIBITING CONTACT WITH S.C.

Freeman argues that even if his conviction is affirmed, this court should remand the case with instructions to correct the community custody condition prohibiting him from contacting S.C. because it is a clerical error. The State concedes. We accept the State's concession.

"A scrivener's error is one that, when amended, would correctly convey the intention of the trial court as expressed in the record at trial." *State v. Starr*, 16 Wn. App. 2d 106, 110 n.3, 479 P.3d 1209 (2021) (emphasis omitted). At sentencing, the trial court expressly stated that it would not "impose another [no-contact order] based on this conviction." 7 VRP (Feb. 3, 2023) at 398. The trial court also crossed out the no-contact provision from Freeman's judgment and sentence. Despite this, the judgment and sentence includes a community custody condition prohibiting Freeman from contacting S.C. Striking the no contact condition "would correctly convey the intention of the trial court as expressed" at sentencing. *Starr*, 16 Wn. App. 2d at 110 n.3 (emphasis omitted). Thus, we remand to the trial court with instructions to correct the scrivener's error by striking the community custody condition prohibiting Freeman from contacting S.C.

No. 57863-8-II

CONCLUSION

Because the challenged statements in the 911 call were nontestimonial, their admission at trial did not violate Freeman's rights under the confrontation clause. Moreover, the statements were admissible under the excited utterance and present sense impression exceptions to the hearsay rule. Furthermore, the to-convict jury instruction was not erroneous. Therefore, we affirm Freeman's conviction, but we remand to the trial court with instructions to strike the community custody condition prohibiting Freeman from contacting S.C.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Cruser, C.J.

Price, J.

23