IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 86454-8-I |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| EDUARDO CASTILLO URBINA, | |
| Appellant. | |

BOWMAN, A.C.J. — A jury convicted Eduardo Castillo Urbina of two counts of second degree rape, one count of second degree assault, one count of fourth degree assault with sexual motivation, and one count of third degree malicious mischief, all crimes of domestic violence (DV) against his wife, M.C. The jury also determined that the two counts of rape and the second degree assault were aggravated DV offenses and that Urbina[1] committed them within the sight and sound of their minor children. Urbina appeals, arguing the trial court erred by (1) admitting evidence of his prior bad acts under ER 404(b), (2) admitting hearsay statements through a social worker as statements for the purpose of medical diagnosis under ER 803(a)(4), (3) allowing irrelevant testimony about M.C.'s feelings at trial and during a defense interview, (4) committing cumulative evidentiary error, (5) declining to give his proposed jury instruction on forcible compulsion, and (6) violating his rights to a jury trial and due process when it imposed an exceptional sentence. Finding no error, we affirm.

_____

[1] We refer to Eduardo Castillo Urbina by his preferred name of Urbina.

FACTS

M.C. and Urbina grew up in the same town in Mexico and both separately moved to the United States. The two did not know each other in Mexico, but when M.C. was 25 years old, Urbina contacted her on social media and the two began chatting online or by phone every day. At the time, Urbina lived with his sister in Kirkland and M.C. lived in North Carolina. After talking for about nine months, Urbina drove from Kirkland to North Carolina to see her. While there, Urbina proposed marriage, and M.C. agreed. She moved to Kirkland with him and they lived with Urbina's sister and her family. After about three months, Urbina and M.C. married. They later had a son and a daughter together. Eventually, Urbina and M.C. moved into a one-bedroom apartment in Kirkland.

Urbina was very controlling during their marriage. He did not allow M.C. to work, wear shorts or dresses, or have social media accounts. M.C. often texted her mother or watched YouTube videos on her phone, and Urbina would look through M.C.'s phone to read her texts or see what she was watching. A couple of times, Urbina became angry and broke M.C.'s phone while he was looking through it. At least one of those times, he broke it by slamming it on the bed or dresser.

At one point, Urbina hurt M.C.'s back, and she needed to see a chiropractor. Urbina did not want M.C. to see a male chiropractor because he did not want another man to touch her. When M.C. could not find a female chiropractor, Urbina escorted her to her first appointment. He then refused to let her return to the male chiropractor.

2

The evening of October 20, 2020, M.C. was on the phone with her mother and Urbina told her to hang up. M.C. refused, and the two began to argue. Urbina slammed M.C.'s phone on the kitchen countertop and cracked the screen, making it unusable. M.C. became upset, went into the bedroom, screamed, and slammed the wall. Urbina came into the room, grabbed M.C., "threw" her onto the bed, held her down with one hand, and covered her mouth with his other hand.

The next morning, at the request of M.C.'s family, police officers arrived at the apartment to perform a welfare check. The officers asked M.C. if she was okay. She told them about Urbina breaking her phone and throwing her on the bed. The officers noted that M.C. had small scratches on her face, a cut on her finger, and bruising on her head. The officers saw that unlike the rest of the apartment, the bedroom was disheveled, with a broken television and jewelry box. The police arrested Urbina, and the court imposed a no-contact order (NCO).

Urbina then moved out of the apartment. But after about six months, M.C. persuaded the court to lift the NCO so Urbina could move back home. After he was back home, Urbina threatened M.C. that if she ever called the police, he would hold her "hostage" and "didn't care if the police came in" or "if they [had] to fire."

Sometime in April or May 2021, not long after Urbina returned home, M.C. found drugs in a bag inside their apartment. When she asked Urbina about the drugs, he at first told M.C. that they were not his but eventually admitted to

possessing them. Around this time, M.C. noticed that Urbina's behavior began to change. He began sweating more, sleeping less, and "hallucinating stuff that wasn't there." He also began accusing M.C. of tracking his location and "hacking his phone." One night, M.C. woke up and saw Urbina crawling into the bedroom. Urbina did not see her wake up. After Urbina crawled away, M.C. found a hidden recording device under the dresser. M.C. became so concerned about Urbina's behavior that she started sleeping with her purse and phone under her pillow.

In late June 2021, M.C. went to bed with their five-year-old son sleeping next to her and their three-year-old daughter in her crib next to the bed.[2] Around midnight, she felt the bed move and woke up to see Urbina standing beside her. Urbina said he wanted to have sex with M.C. and told her to take off her pants. M.C. refused. Urbina then stood on the bed next to her face, started masturbating, and tried to force his penis into her mouth. M.C. blocked her mouth with her hand. Urbina ejaculated on her face, hair, and hand.

Urbina then grabbed his belt from the living room and struck M.C.'s legs several times through her comforter. He tried to take off her pants and force her to have sex with him. M.C. again refused and told him that she did not want to have sex because she was "on [her] period." Urbina told her there were "other ways to do it" and threatened to hit M.C. with his belt. He then looped his belt into a circle, making M.C. think he would choke her with it. M.C. tried to resist Urbina, but he managed to forcibly remove her tampon and rape her. Urbina stopped when their daughter woke up and started crying.

---

[2] The crib and the bed were "together," so that M.C.'s side of the bed was "touching" the crib.

Urbina then brought out the recording device M.C. had previously seen him hide under their dresser. Using his laptop, Urbina played an audio recording for M.C. and accused her of having sex with another man. M.C. recognized that it was a recording of the two of them having sex on a previous occasion and explained that to Urbina, but "[h]e didn't believe [her]." Urbina became angry and played the recording over and over, asking M.C. who she was with in the recording and threatening to choke her. This continued for hours, until 5:00 or 6:00 in the morning when M.C. heard their neighbor's alarm go off.

After hearing the alarm, M.C. took the children to the living room and Urbina went into the bathroom with the recording device and laptop. Urbina called M.C. into the bathroom and threatened her with his belt, saying he would "make [her] go" if she refused. When M.C. entered the bathroom, she left the door open. Urbina was not wearing pants and masturbating while playing the recording. M.C. again told Urbina she did not want to have sex because she was "spotting." And Urbina again told her there were other ways to have sex. He then grabbed M.C. by her shoulders and hair, turned her around, and raped her. The children were about 20 feet away.

A few days later on June 25, M.C. was talking to her mother on the phone while sitting at a picnic table outside the apartment with the kids. Urbina arrived home and told M.C. to go inside but she stayed at the table. Urbina then went up to their second floor balcony and threw a bottle of alcohol he had been drinking at M.C. The glass bottle broke on the concrete picnic table. M.C. continued talking to her mother on the phone for a few minutes until Urbina came down to

the table. He demanded M.C.'s phone, and she gave it to him. He looked through her phone and then slammed it on the concrete table, breaking it.

M.C. then got up from the table and Urbina grabbed her arm. He led her back toward the apartment and the kids followed. Once inside their apartment, Urbina told M.C. to admit that she had been with someone else. M.C. told him she did not have anybody else. Urbina "begged" M.C. to tell him the truth, and she continuously repeated that she "wasn't doing anything with anybody" and had "not met anybody." Urbina put his hands on M.C.'s neck and started choking her. She was holding their son at the time and their daughter was nearby. M.C. felt her vision go black, and when she was about to lose consciousness, Urbina let go. He then strangled her again. This time when he let go, M.C. started coughing blood. Urbina strangled her a third time and then punched her in the head with a closed fist.

Urbina stopped choking M.C. and left the room. M.C. ran out the front door with the children. Urbina followed, telling M.C. to stop and get back into the apartment. He caught up to M.C. and grabbed her. A neighbor, Christopher Beers, saw the encounter and asked M.C. if she needed help. M.C. said "yes" and Beers dialed 911. Several firefighters and police officers arrived, and M.C. told them that Urbina had "choked and punched" her. She told Kirkland Police Department Officer Kaila Morris that Urbina forced her to have sex with him several times. Officers arrested Urbina and Officer Morris went to the hospital with M.C. and the children.

6

At the EvergreenHealth Medical Center emergency room, M.C. told the doctors and nurses about the rapes. A CT[3] scan revealed that the hyoid bone in her neck was broken. And a nurse performed a forensic interview and sexual assault nurse examination (SANE) on M.C. A hospital social worker, Burr Corley, was present during the nurse's interview and asked M.C. questions to understand what kind of support she might need and provide resources. Based on the interview, Corley referred M.C. to DV and sexual assault resources and two counseling agencies. He also made a report to Child Protective Services (CPS).

The State charged Urbina with two counts of second degree rape, one count of second degree assault, one count of fourth degree assault with sexual motivation, and one count of third degree malicious mischief, all DV crimes. It also alleged that the two counts of second degree rape and the second degree assault were aggravated DV offenses and that they occurred within the sight or sound of their minor children. The case went to jury trial in February 2024.

At trial, M.C. testified with help from an interpreter. She talked about her relationship with Urbina and the June 2021 rapes and assaults. She told the jury that Urbina prohibited her from using social media, did not let her work outside the home, and stopped her from seeing male doctors. She also testified about the several times Urbina broke her phone. And she described the October 2020 assault when Urbina was arrested.

---

[3] Computerized tomography.

Urbina's theory at trial was that he lacked the capacity to commit the assaults and malicious mischief with intent. Psychiatrist Dr. Steven Juergens opined that Urbina could not form the intent to commit those crimes because he suffered from methamphetamine use disorder, methamphetamine intoxication, and methamphetamine induced psychosis at the time of the incidents. And Urbina generally denied the rape charges, arguing that M.C. consented to the sexual contact and then lied about it out of regret.

The jury convicted Urbina as charged. The jury also found that the two counts of second degree rape and the second degree assault were aggravated DV offenses and that Urbina committed them within the sight or sound of their minor children. The court imposed an exceptional, concurrent, indeterminate sentence of 260 months to life.

Urbina appeals.

ANALYSIS

Urbina argues the trial court erred by (1) admitting evidence of his prior bad acts under ER 404(b), (2) admitting hearsay statements through hospital social worker Corely as statements made for the purpose of medical diagnosis under ER 803(a)(4), (3) allowing irrelevant testimony that M.C. was "[o]verwhelmed" at trial and that the defense interview was "[a] lot," (4) committing cumulative evidentiary error depriving him of his right to a fair trial, (5) declining to give his proposed jury instruction on forcible compulsion, and (6) violating his rights to a jury trial and due process when it imposed an exceptional sentence. We address each argument in turn.

8

1. ER 404(b)

Urbina argues the trial court erred by admitting "numerous alleged prior bad acts" under ER 404(b). We disagree.

We review the court's admission of evidence under ER 404(b) for abuse of discretion. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. *State v. Scherner*, 153 Wn. App. 621, 656, 225 P.3d 248 (2009), *aff'd*, *State v. Gresham*, 173 Wn.2d 405, 269 P.3d 207 (2012).

ER 404(b) prohibits admission of "evidence offered to 'show the character of a person to prove the person acted in conformity' with that character at the time of the crime." *State v. Foxhoven*, 161 Wn.2d 168, 174-75, 163 P.3d 786 (2007) (quoting *State v. Everybodytalksabout*, 145 Wn.2d 456, 466, 39 P.3d 294 (2002)). But ER 404(b) does not prohibit prior misconduct for other purposes, such as proving motive, intent, a common scheme or plan, or a lack of mistake or accident. *Gresham*, 173 Wn.2d at 420-21. The list of purposes for which evidence of a defendant's prior misconduct may be introduced under ER 404(b) is not exclusive. *State v. Grant*, 83 Wn. App. 98, 105, 920 P.2d 609 (1996).

Washington courts have developed a thorough analytical structure for the admission of evidence of a person's prior crimes, wrongs, or acts. *See, i.e.*, *Gresham*, 173 Wn.2d at 421. To admit evidence of a person's prior misconduct, the trial court must

> "(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to

prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect."

*Id.* (quoting *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). The third and fourth elements ensure that the admission of the evidence does not violate ER 402 (irrelevant evidence inadmissible) or ER 403 (exclusion of relevant evidence). *Id.*

Evidence is unfairly prejudicial if it is likely to elicit an emotional response rather than a rational decision. *State v. Powell*, 126 Wn.2d 244, 264, 893 P.2d 615 (1995). Unfair prejudice is that caused by evidence of " 'scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.' " *Carson v. Fine*, 123 Wn.2d 206, 223, 867 P.2d 610 (1994)[4] (quoting *United States v. Roark*, 753 F.2d 991, 994 (11th Cir. 1985)). We afford trial courts broad discretion "in balancing the probative value of evidence against its potential prejudicial impact." *State v. Coe*, 101 Wn.2d 772, 782, 684 P.2d 668 (1984).

Here, the trial court admitted several "bad acts" after properly analyzing them under ER 404(b). It determined that evidence of Urbina's prior controlling behavior, such as breaking M.C.'s phone; prohibiting her from working outside the home, using social media, or seeing male doctors; and assaulting her in October 2020, was admissible for nonpropensity purposes. Specifically, Urbina's misconduct "could be used to rebut the material assertion that [he] did not have the requisite capacity" to commit the crimes. And the evidence could be offered to show M.C.'s "state of mind, how she acted, why she acted, or why she didn't do what perhaps some people might think she ought to have done."

---

[4] Internal quotation marks omitted.

Urbina does not dispute that evidence of his prior bad acts were probative to the elements of several of the charged crimes. For example, Urbina agrees that the 2020 assault was probative to show that M.C. had reason to fear him and that her fear was relevant to the forcible compulsion element of the rape charges.[5] And he acknowledges that evidence of his controlling behavior was probative to rebut Dr. Juergen's testimony that Urbina's methamphetamine use caused those behaviors.

But Urbina argues that the 2020 assault was irrelevant to the nonrape charges because those offenses have no element requiring reasonable fear. And evidence of the controlling behavior was irrelevant to the rape charges because his diminished capacity defense applied to only the assault and malicious mischief charges. According to Urbina, all the evidence had "very limited probative value because only one incident was relevant to fear, which itself was relevant to only two of five counts, and the evidence was not relevant to rebut a defense on the two most serious charges in the case." Finally, Urbina argues the prejudicial effect of all the evidence was "extreme" because the State "painted a picture of [him] as a paranoid and controlling husband."

Even assuming without deciding that Urbina's assessment of the probative value of the evidence is correct, he fails to show error. Each of the admitted "bad acts" was relevant to an essential element of a charge or to rebut his affirmative defense. And Urbina fails to show that the evidence was likely to invoke an

_____

[5] The judge instructed the jury that "[a] person commits the crime of rape in the second degree when he or she engages in sexual intercourse with another person by forcible compulsion." And "forcible compulsion" means physical force or a threat "that places a person in fear of death or physical injury."

emotional response from the jury rather than a rational decision. Indeed, at Urbina's request, the court limited the purpose for which the jury could consider the evidence. It instructed the jury:

> You may have heard evidence concerning alleged prior incidents of misconduct on dates other than that of the charged incidents, including but not limited to [M.C.'s] use of social media, working, visiting a male chiropractor, leaving the house without notifying [Urbina], damage to cell phones, and a prior incident of [DV] from October of 2020. Such evidence may only be considered by you to the extent you find it relevant to issues of [M.C.'s] state of mind, the reasonableness of her fear, and Dr. . . . Juergen's opinion and findings regarding the dates of the charged incidents. It is not to be considered by you for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation.

Urbina disagrees. He argues this case is like *State v. Bauer*, No. 86608-7-I (Wash. Ct. App. Dec. 16, 2024) (unpublished),[6] https://www.courts.wa.gov/opinions/pdf/866087.pdf. In *Bauer*, the State charged the defendant with three counts of first degree aggravated murder involving the use of a firearm. *Id.* at 7. At trial, the defendant testified that he "would not shoot someone, regardless of the circumstances." *Id.* at 8. As a result, the trial court allowed the State to present rebuttal evidence from the defendant's ex-girlfriend that he had, in fact, shot at someone before. *Id.* at 6. But his ex-girlfriend testified to much more. *Id.* at 8-9. She explained that the defendant was " 'muscle' " for a drug dealer and described how he organized a meeting with another drug user, lay in wait, and then shot at him. *Id.*

---

[6] "Washington appellate courts should not, unless necessary for a reasoned decision, cite or discuss unpublished opinions in their opinions." GR 14.1(c). "However, unpublished opinions of the Court of Appeals filed on or after March 1, 2013, may be cited as nonbinding authorities, if identified as such by the citing party, and may be accorded such persuasive value as the court deems appropriate." GR 14.1(a).

On appeal, we concluded that the testimony was unduly prejudicial because it went far beyond the fact that the defendant had shot at someone before. *Bauer*, No. 86608-7-I, slip op. at 8-9. And the prejudicial effect of the "expansive surrounding statements" outweighed any probative value they might have provided, creating an image that Bauer was a "hardened criminal, fully entrenched in the drug trade." *Id.* at 9.

This case is not like *Bauer*. Here, all the bad acts described by M.C. were probative to an element of at least one charged crime. Unlike in *Bauer*, the evidence was not "dragged in by the heels for the sake of its prejudicial effect." *Roark*, 753 F.2d at 994. As a result, the trial court did not abuse its discretion by admitting the evidence under ER 404(b).

## 2.  ER 803(a)(4)

Urbina argues the court erred by permitting social worker Corley to testify about M.C.'s out-of-court statements. We disagree.

We review a trial court's decision to admit a hearsay statement under ER 803(a) for an abuse of discretion. *State v. Ohlson*, 162 Wn.2d 1, 7-8, 168 P.3d 1273 (2007). We will reverse an evidentiary ruling only if it results in prejudice. *State v. Neal*, 144 Wn.2d 600, 611, 30 P.3d 1255 (2001). "An error is prejudicial if, 'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.' " *Id.* (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)). Improperly admitted evidence is harmless if it is of minor significance in relation to the evidence as a whole. *Id.*

An out-of-court statement offered to prove the truth of the matter asserted is inadmissible hearsay unless an exception applies. ER 801(c), 802. Statements made for the purpose of medical diagnosis or treatment are an exception to the bar on hearsay. ER 803(a)(4) (allowing statements "describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment"). For purposes of ER 803(a)(4), "medical" applies to both physical and mental health. *See In re Dependency of M.P.*, 76 Wn. App. 87, 92-93, 882 P.2d 1180 (1994). Accordingly, the medical diagnosis hearsay exception can include statements made to social workers so long as they are for the purpose of medical diagnosis or treatment. *Id.*

ER 803(a)(4) applies only when a statement is "reasonably pertinent to diagnosis or treatment." "A party demonstrates a statement to be reasonably pertinent when (1) the declarant's motive in making the statement is to promote treatment, and (2) the medical professional reasonably relied on the statement for purposes of treatment." *State v. Williams*, 137 Wn. App. 736, 746, 154 P.3d 322 (2007). Statements attributing fault are generally inadmissible under this exception, but statements "disclosing the identity of a closely-related perpetrator" may be reasonably pertinent to treatment in situations like DV or sexual abuse "because part of reasonable treatment and therapy is to prevent recurrence and future injury." *Id.*

Here, Corley testified that he is a licensed clinical social worker who works in the emergency department at EvergreenHealth. In this role, he performs

mental health exams and attends interviews for sexual assault and DV cases. He participates in the SANE nurse's interview to "get the patient's story" and "help provide resources for the patient for their well-being." Corley testified that he interviewed M.C. with the SANE nurse for about 45 minutes to help provide resources to M.C. While the nurse asked M.C. most of the questions, Corley asked "some specific questions in order to understand what kind of support she might need because [Corley] was the one providing the resources at the end."

Corley testified that M.C. told him Urbina sexually assaulted her twice and physically assaulted her once a few days before the interview. In describing the assaults, she told Corley that Urbina accused her of cheating, forced her to lie on her side in bed, forcibly removed her tampon, and choked, punched, and raped her. And she said her husband later "threatened to choke her again" and then raped her again in the bathroom. She explained that she feared Urbina. Corley also testified that M.C. told him the children were present during the first rape. And she had little support in the community because her family was in Texas. Based on M.C.'s answers, Corley referred M.C. to DV and sexual assault resources and two different counseling agencies. He also reported the incident to CPS.

The evidence shows that Corley sought medical information to refer M.C. to the appropriate services, that M.C. provided such information to promote that purpose, and that Corley then relied on the information to make the appropriate referrals. And as much as M.C. identified Urbina as the person who assaulted her, that information was pertinent to assessing whether certain services were

necessary to prevent recurrence and future injury. Indeed, Corley recommended DV and sexual assault resources.

Citing *State v. Lopez*, 95 Wn. App. 842, 980 P.2d 224 (1999), Urbina argues Corley was seeking information for forensic, not medical, purposes. In *Lopez*, the court allowed a social worker who conducted a forensic interview of child victims to testify about statements made to her by the victims under the medical diagnosis exception to hearsay. *Id.* at 846-47. The prosecutor told the court that the statements were elicited during a forensic interview in which they were " 'looking for information.' " *Id.* at 849. The State conceded that the forensic interviewer did not conduct the interviews for the purpose of medical diagnosis or treatment. *Id.* at 850. And the court held that interviews conducted by a social worker for purely forensic purposes are not admissible under ER 803(a)(4). *Id.*

This case is not like *Lopez*. Here, Corley did not ask questions to gather information to be used in a prosecution or for purely forensic purposes. Instead, he asked questions for medical purposes to understand what resources M.C. might need to address her safety, prevent future harm, and support her physical and mental health.

Urbina also compares this case to *State v. Perez*, 137 Wn. App. 97, 151 P.3d 249 (2007). In *Perez*, the State charged the defendant with third degree assault of a child. *Id.* at 100. At trial, the court admitted under ER 803(a)(4) the victim's statements made to a state social worker shortly after the incident. *Id.* at 101-02. Division Three of this court held that the trial court erred in admitting the

statements because the social worker interviewed the victim to investigate the incident, not to provide medical diagnosis or treatment. *Id.* at 106-07.

This case is also not like *Perez.* Again, Corley did not interview M.C. to investigate the incident. He interviewed her to determine the appropriate physical and mental health services for M.C.

The court did not err by admitting M.C.'s statements to Corley under ER 803(a)(4).[7]

3. Relevance of M.C.'s Testimony

Urbina argues the trial court violated ER 402 by allowing M.C. to testify that she was "[o]verwhelmed" at trial and that the defense interview was "[a] lot." He contends that M.C.'s feelings were irrelevant to any issue at trial.[8] We disagree.

Again, we review evidentiary rulings for an abuse of discretion. *Ohlson*, 162 Wn.2d 1 at 7-8. Generally, all relevant evidence is admissible. ER 402.

---

[7] Even if the court erred by admitting the statements, any error was harmless. M.C. testified at trial. She identified Urbina as the perpetrator and described the incidents in more detail than her statements to Corley. As a result, the hearsay statements admitted through Corley were of minor significance compared to M.C.'s own testimony and unlikely to have materially affected the outcome of the trial. *See Neal*, 144 Wn.2d at 611 (improperly admitted evidence is harmless if of minor significance related to evidence as a whole).

[8] Urbina also argues that M.C.'s statements were inadmissible under ER 403 (exclusion of relevant evidence if it is more prejudicial than probative). But at trial, Urbina objected as to only relevance. So, we need not reach that issue. *See* RAP 2.5(a) ("appellate court may refuse to review any claim of error which was not raised in the trial court"); *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985) ("A party may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial."). He also alleges that M.C.'s testimony violated his constitutional rights to be present in the courtroom and confront witnesses. *See* U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. But again, Urbina did not object on that basis, and he shows no manifest constitutional error. *See* RAP 2.5(a)(3).

Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." ER 401. The party seeking to exclude relevant evidence bears the burden of establishing unfair prejudice. ER 402; *Carson*, 123 Wn.2d at 224-25 (citing ER 403). The threshold to admit relevant evidence is very low, and even minimally relevant evidence is admissible. *State v. Darden*, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002).

Here, during direct examination, the prosecutor asked M.C., "How are you feeling today." Urbina objected as to relevance and the court overruled his objection. M.C. then answered, saying she was "[o]verwhelmed." Later, on cross-examination, Urbina used statements M.C. made during a pretrial defense interview to impeach parts of her testimony from direct examination. So, during redirect examination, the prosecutor followed up with questions about M.C.'s pretrial defense interview. M.C. testified that the interview took place over three days, lasting about two hours each day. The prosecutor asked M.C., "How did that feel," and Urbina objected as to relevance. The court overruled the objection. The prosecutor repeated the question, and M.C. answered, "A lot."

M.C.'s testimony during direct examination that she was feeling overwhelmed was relevant to her credibility. The court charged the jury with assessing M.C.'s credibility and told them they could do so by observing her manner and demeanor on the stand.[9] M.C.'s acknowledgment that she felt

---

[9] The judge instructed the jury that they were the "sole judges of the credibility of each witness" and that in considering a witness' testimony, they may consider "the manner of the witness while testifying."

overwhelmed was information the jury could use to assess her manner and demeanor.  Similarly, M.C.'s state of mind during the defense interview was also relevant to her credibility.  Urbina attacked M.C.'s credibility on cross-examination by pointing out inconsistent statements she gave during the defense interview.  So, the length of the interview and the fact that it was "[a] lot" for M.C. was information the jury could use to weigh the inconsistent statements in assessing her credibility.

The trial court did not err by allowing M.C.'s testimony about her feelings at trial and during the defense interview.[10]

4.  <u>Cumulative Error</u>

Urbina contends he is entitled to a new trial because the cumulative effect of the trial court's evidentiary errors denied him a fair trial.  We disagree.

Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair.  *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (2012).  "Cumulative error" is "limited to instances where there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may deny a defendant a fair trial."  *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000).

Because we conclude that Urbina shows no prejudicial error, his claim of cumulative error fails.

---

[10] Again, even assuming the trial court erred by admitting this testimony, Urbina fails to show prejudice.  The testimony was insignificant in comparison to the totality of her testimony about the rapes and assaults.  So, it is unlikely the testimony materially affected the outcome of the trial.  *See Neal*, 144 Wn.2d at 611.

5. Forcible Compulsion Jury Instruction

Urbina argues the court erred by refusing to give the jury his proposed jury instruction on forcible compulsion. Again, we disagree.

"Jury instructions are proper when they permit the parties to argue their theories of the case, do not mislead the jury, and properly inform the jury of the applicable law." *State v. Barnes*, 153 Wn.2d 378, 382, 103 P.2d 1219 (2005). A defendant is entitled to have the jury instructed on their theory of the case if there is evidence to support that theory. *State v. Butler*, 200 Wn.2d 695, 715, 521 P.3d 931 (2022). If a jury instruction correctly states the law, we review the trial court's decision whether to give the instruction for abuse of discretion. *State v. Aguirre*, 168 Wn.2d 350, 364, 229 P.3d 669 (2010).

Here, the trial court instructed the jury that "[a] person commits the crime of rape in the second degree when he or she engages in sexual intercourse with another person by forcible compulsion." Urbina requested that the court also instruct the jury:

> "Forcible compulsion" means physical force that overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to himself or herself or another person, or in fear of being kidnapped or that another person will be kidnapped.

> In the absence of physical force, a finding of forcible compulsion cannot be based solely on the victim's subjective reaction to particular conduct. The victim must perceive a threat, and the defendant must communicate an intent to inflict physical injury in order to coerce compliance.

The court refused to give the second paragraph of Urbina's proposed instruction. Instead, it instructed the jury only that "[f]orcible compulsion" means "physical

force that overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to himself or herself or another person, or in fear of being kidnapped or that another person will be kidnapped."

Pointing to *State v. Weisberg*, 65 Wn. App. 721, 829 P.2d 252 (1992), Urbina argues the trial court erred by refusing to give his proposed instruction. In *Weisberg*, the victim testified that she was in the defendant's bedroom trying on clothing when he asked her to remove her underwear. *Id.* at 723. The victim "did not immediately take off her bra and panties," so the defendant removed them for her. *Id.* The defendant then told the victim to lie down on the bed. *Id.* She told the defendant she did not want to, but he told her to " 'go ahead and lay on the bed anyway.' " *Id.* The defendant began having intercourse with the victim but "immediately" stopped when she asked him to. *Id.* at 724.

The State charged the defendant with second degree rape by forcible compulsion. *Weisberg*, 65 Wn. App. at 724. At trial, the victim testified that she did not try to stop the defendant sooner because "she was afraid 'that he might try to hurt me or something, and I didn't want to take the chance.' " *Id.* at 723. A jury convicted the defendant of second degree rape. *Id.* at 724. The defendant appealed, arguing insufficient evidence supported his conviction. *Id.* at 722. Division Two of our court agreed and held that the evidence was not sufficient to show forcible compulsion. *Id.* at 726-27. It noted:

> A close examination of the record produces no indication of
> anything in [the defendant]'s communications with [the victim], or in
> the situation, that would cause one to interpret "lay down on the
> bed anyway" as a veiled threat of physical injury. Absent conduct
> by [the defendant] that produced [the victim]'s stated fear, there is

21

no forcible compulsion, an essential element of rape in the second degree.

*Id.* at 726.

This case is not like *Weisberg*. Here, the evidence does not support finding that the forcible compulsion was solely based on M.C.'s subjective reaction to Urbina's conduct. Instead, the evidence showed that Urbina used physical force to overcome M.C.'s resistance and that he explicitly threatened to use force. M.C. testified that the first time she refused sex, Urbina brought out his belt and smacked it against her leg through the comforter. M.C. again told Urbina she did not want to take off her pants or have sex with him and Urbina still tried to force his penis into her mouth. When M.C. said she did not want to have sex because she was on her period, Urbina told her there were "other ways to do it" and looped his belt into a circle, making her think he planned to choke her with it. Urbina then pushed M.C. onto her side, pulled off her pants, removed her tampon, and raped her.

And in the second instance, M.C testified that Urbina again threatened her with his belt if she did not come into the bathroom, telling her he would "make [her] go" if she refused. And she again told him she did not want to have sex because she was on her period. But, like the first time, he ignored her request and told her there were other ways to do it. Urbina then grabbed her shoulders and hair, turned her around, and raped her.

This evidence shows that unlike the circumstances in *Weisberg*, Urbina explicitly threatened the use of force and actually used force to overcome M.C.'s resistance to his actions. Indeed, Urbina did not argue at trial that M.C.

22

misperceived his actions as a threat. Instead, he argued that M.C. consented to the sexual contact and then lied about his use of threats and force.

Because the evidence did not support an instruction on forcible compulsion "[i]n the absence of physical force," it was not an abuse of discretion for the trial court to refuse to give one.

## 6. Exceptional Sentence

Urbina argues that the court imposed an exceptional sentence in violation of his Sixth Amendment right to a trial by jury. U.S. CONST. amend. VI. We disagree.

The Sixth Amendment guarantees criminal defendants a right to trial by jury. That right requires that a jury determine beyond a reasonable doubt " 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum.' " *State v. Sage*, 1 Wn. App. 2d 685, 707, 407 P.2d 359 (2017) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)). But a jury need not determine " 'the fact of a prior conviction.' " *Id.* (quoting *Apprendi*, 530 U.S. at 490).

Under RCW 9.94A.537(3), "[t]he facts supporting aggravating circumstances shall be proved to a jury beyond a reasonable doubt. The jury's verdict on the aggravating factor must be unanimous, and by special interrogatory." If a jury unanimously finds beyond a reasonable doubt the existence of "one or more of the facts alleged by the [S]tate in support of an aggravated sentence," the court may impose an exceptional sentence "if it finds

. . . that the facts found [by the jury] are substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.537(6).

In *Sage*, we held that this sentencing scheme complies with the Sixth Amendment right to a jury trial. *See* 1 Wn. App. 2d at 707-10. This is because a jury determines whether the facts show beyond a reasonable doubt that the defendant's conduct amounts to an aggravating circumstance. *Id.* at 709. And the judge makes the legal determination whether those aggravating circumstances are sufficiently substantial and compelling to warrant an exceptional sentence. *Id.*

Here, the jury entered special verdict forms, finding beyond a reasonable doubt that Urbina's conduct amounted to aggravated DV offenses and that he committed them within the sight or sound of their minor children—statutory aggravating circumstances. RCW 9.94A.535(3)(h)(ii). Then, at sentencing, the court recognized those findings and made a legal determination that they warranted an exceptional sentence:

> To sort of just acknowledge that and not hold the defendant accountable accordingly I think would be a great injustice and does not serve either [M.C.] or the community well in any way. Therefore, I am going to impose an exceptional sentence upward that he is to face the minimum sentence of 260 months, with a maximum term for life.

Under *Sage*, the court's process did not violate Urbina's Sixth Amendment right to a jury.

Still, pointing to *Hurst v. Florida*, 577 U.S. 92, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016), Urbina argues we should reject our holding in *Sage*. But as we

recognized in *Sage*, the statutory scheme in *Hurst* is different from the scheme under Washington's SRA.[11]

> In *Hurst*, the Supreme Court held Florida's death penalty procedure violated the defendant's Sixth Amendment right to a jury trial because the jury's findings of aggravating factors were advisory, resulting in prohibited fact finding by the judge. But the Florida statute at issue expressly state[d] that the jury findings were "advisory." FLA. STAT. § 921.141 (2004). By contrast, under Washington procedure here, the jury exclusively resolves the factual question whether the aggravating circumstances have been proven beyond a reasonable doubt.

*Sage*, 1 Wn. App. 2d at 710 n.86. We decline to part from our holding in *Sage*.

Because the trial court did not abuse its discretion and Urbina shows no prejudicial error, we affirm his convictions and sentence.

_____, ACJ

WE CONCUR:

_____         _____
Díaz, J.                         Mann, J.

---

[11] Sentencing Reform Act of 1981, chapter 9.94A RCW.